**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **LOGAN BARNHART,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Logan Barnhart to a term of incarceration of 63 months, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for the count of conviction.

## I.    INTRODUCTION

The defendant, Logan Barnhart, a forty-two-year-old pipe layer from Holt, Michigan, violently participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Barnhart and his co-defendants were violent actors amidst the large mob on the Lower

---

[1] Although the stipulated Statement of Offense filed in this case reflects a sum of more than $1.4 million dollars for repairs, *see* ECF No. 235 at ¶ 6, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol Building and grounds and certain costs borne by the United States Capitol Police.

West Terrace ("LWT") of the United States Capitol Building.   The mob in this location – and, in particular, Barnhart and his co-defendants -- attacked a line of police officers who were positioned in an archway at the front of a passageway that led to the interior of the building (the "Archway"), assaulted officers and knocked them to the ground.   During the course of this attack, Barnhart grabbed an officer's neck and torso and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs into the violent mob, where the officer was further attacked with weapons, including a flagpole and a baton, and sustained physical injuries.   Minutes later, Barnhart returned to the police line in the Archway where other rioters were assaulting the line of officers by slamming riot shields into them, striking them, and throwing objects at them. Barnhart joined these rioters in charging against the police line.   Barnhart then approached the line of officers wielding a flagpole and used it to strike the officers.

The Government recommends that the Court sentence Barnhart to 63 months' incarceration for his conviction of violating 18 U.S.C. § 111(a) and (b), a sentence at the top of the advisory Guidelines range of 51 to 63 months, which the Government submits is the correct Guidelines calculation.   Such a sentence reflects the seriousness of Barnhart's criminal conduct.

## II.       FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

The Government refers the Court to the stipulated Statement of Offense filed in this case, ECF 235, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the most violent confrontations on January 6, 2021 occurred near an entrance to the Capitol Building in the area known as the LWT. The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel"). That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the Tunnel is framed by a stone archway -- the Archway -- that is a visual focal point at the center of the West Front of the Capitol Building, as circled in red below.



*Exhibit 1*[2]

On January 6, 2021, when rioters arrived at the doors behind this Archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m. the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items.   Officers created a line in the doorway to block the rioters and in

---

[2] Exhibit 1 is taken from "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

turn used physically engaged them with batons and OC spray.

The violent battle for control over the LWT entrance in the Tunnel and doorway area continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers, engaging them in intense hand-to-hand combat. Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential members of Congress.

### B.    Logan Barnhart's Role in the January 6, 2021 Attack on the Capitol

During a particularly volatile period on the LWT, Barnhart came to the forefront of the crowd and dragged an officer from the police line into an armed and angry mob of rioters. Barnhart then returned to the police line and assaulted officers with a flagpole.   Barnhart has failed to offer remorse for his actions and downplayed the attack on the Capitol on social media. Barnhart's criminal actions are documented in footage from body-worn cameras ("BWC") worn by MPD officers, USCP CCV footage, and open-source video and photographs.

#### *Barnhart's Assaults of MPD Officers*

Barnhart and his co-defendants' actions on the LWT manifested in a brutal 90-second group assault on multiple officers, many of whom sustained significant injuries.   By the time the assaults in this case occurred, police officers had been defending the Tunnel for nearly two hours, advancing and retreating as rioters fought their way into the Tunnel.   In the minutes prior to this assault, officers had succeeded in expelling rioters from the Archway and the Tunnel.

The situation escalated considerably at approximately 4:27 p.m. when co-defendant Justin Jersey moved toward the front of the crowd and charged at the line of officers that were positioned in the Archway.   Officers A.W., B.M., and C.M. were amongst those officers.   Jersey grabbed Officer A.W.'s baton with one hand and reached towards Officer A.W.'s face and knocked him to the ground.   While Officer A.W. was lying on the ground of the Archway, co-defendant Jack Wade Whitton leapt over a fence, kicked at Officer A.W. and then struck Officer B.M. and other officers with a crutch multiple times.   With the commencement of those assaults, other rioters surged towards the Archway, throwing objects at the officers, and striking at them with makeshift weapons such as a baton, a hockey stick, a piece of wood, flagpoles, and a police riot shield.   *See* Exhibit 2 at 00:30-1:00. [3]



*Exhibit 2A (Exhibit 2 at 00:51)* [4]

---

[3] Exhibit 2 is video footage captured by an individual located on the south side of the LWT.
[4] Exhibit 2A is still shot from Exhibit 2 at 00:51.   Jersey is circled in green.   Whitton is circled in red.   Barnhart is circled in yellow.

As Whitton was striking Officer B.M., Barnhart quickly moved through the crowd, climbed over a railing and ascended the steps leading to the Archway and approached Officer B.M.   *See* Exhibit 2 at 00:49-00:59.



*Exhibit 2B (Exhibit 2 at 00:54)*[5]

 As a result of Whitton's assault, Officer B.M. fell to the ground.   Whitton then grabbed Officer B.M., first by his baton, then by the helmet and neck of the officer's ballistic vest.   *See* Exhibit 3 at 16:27:25 – 16:28:30; Exhibit 3A.   Barnhart then reached through Whitton's arms and grabbed the neck of Officer B.M.'s ballistic vest.   Exhibit 3B.

---

[5] Exhibit 2B is still shot from Exhibit 2 at 00:54.   Jersey is circled in green.   Whitton is circled in red.   Barnhart is circled in yellow.



*Exhibit 3A[6]*



*Exhibit 3B[7]*

[6] Exhibit 3 is footage from the BWC of MPD Officer C.M., who was present in the Archway. The pertinent timestamp of this footage is 16:26:27 to 16:27:26.   Exhibit 3A is a still shot from Exhibit 3.   Whitton is circled in red.   Barnhart is circled in yellow.

[7] Exhibit 3B is a still shot from Exhibit 3.   Whitton is circled in red.   Barnhart is circled in yellow.

Barnhart and Whitton then dragged Officer B.M. headfirst over Officer A.W., out of the police line and away from the Archway, down the steps in a prone position and into the crowd, where other rioters, including co-defendants Peter Stager and Mason Joel Courson, beat Officer B.M. with a flagpole and a baton.   Exhibit 3C.   Co-defendant Jeffrey Sabol assisted in dragging Officer B.M. down the stairs.   As a result of this attack, Officer B.M. sustained physical injuries including bruising and abrasions.



Exhibit 3C[8]

---

[8] Exhibit 3C is a still shot from Exhibit 3.   Whitton in circled in red.   Barnhart is circled in yellow.

An aerial photograph was taken as Barnhart, Whitton, and Sabol dragged Officer B.M.

down the stairs and into the mob.   Exhibit 4A.



Exhibit 4A[9]

---

[9] Whitton in circled in red.   Barnhart is circled in yellow.   Sabol is circled in orange.

A zoomed-out view of Exhibit 4A depicts eight of the nine defendants in this case and illustrates their proximity to one another as they committed the crimes charged in the superseding indictment.   Exhibit 4B.



Exhibit 4B[10]

While Officer A.W. was on the ground, his helmet was knocked off, Sabol stole his baton, and he was further assaulted by other members of the mob.   Co-defendant Ronald Colton McAbee then grabbed at Officer A.W.'s torso, while co-defendant Clayton Ray Mullins grabbed Officer A.W.'s leg and the two engaged in a tug-o-war with officers who were trying to pull Officer A.W. back into the Archway.   Eventually, McAbee pulled Officer A.W. out of the Archway and the two slid down a set of stairs and into the crowd together, with McAbee on top of Officer A.W. and

---

[10] Barnhart is circled in yellow.   Whitton is circled in red.   Sabol is circled in orange.   Jersey is circled in green.   Mullins is circled in light blue.   Stager is circled in dark blue.   McAbee is circled in purple.   Courson is circled in gray.

pinning Officer A.W. down.   As he was dragged into the mob, Officer A.W. was kicked, struck

with poles, and stomped on by several individuals.   Additionally, Officer A.W. recalled being

maced once his gas mask was ripped off.   When a third officer, Officer C.M., stepped out of the

Archway in an attempt to come to the aid of Officers A.W. and B.M., he was assaulted by McAbee,

then by co-defendant Michael Lopatic.   *See generally* Exhibits 2, 3, 4A, 4B.

Minutes after Barnhart and his co-defendants and other rioters assaulted Officers A.W.,

B.M., and C.M., Barnhart ascended the stairs to the Archway again.   At approximately 4:30 p.m.,

Barnhart and other rioters forcibly charged and pushed against the police line in the Archway.

Exhibit 5.[11]



*Exhibit 5*

---

[11]  Exhibit 5 is an open-source video filmed by an individual who was on the LWT.   The video
can be located at https://www.youtube.com/watch?v=C4sII5URW5Q&t=728s.   Barnhart is
captured on the video starting at the 11:40 mark.   In the screenshot, Barnhart is circled in
yellow.

The officers were able to push back Barnhart and others away from their police line. Undeterred, Barnhart reapproached the police line and assaulted officers with a flagpole.   Exhibit 6.



*Exhibit 6[12]*

Evidence of Barnhart's second round of assaults that occurred between 4:31 and 4:33 p.m. was not located until after the superseding indictment was returned and while the parties were actively engaged in plea negotiations.   Had the evidence been located sooner, Barnhart would have been charged with additional criminal offenses.

### *Barnhart's Social Media*

On January 7, 2021, Barnhart posted several images to his Instagram account of the riot that occurred the day before.   The posts demonstrate that Barnhart was proud of his involvement in the violent assaults against police that took place on January 6, 2021 and his lack of remorse.

---

[12]  Exhibit 6 is video footage from the USCP CCV from the Tunnel from approximately 4:31 p.m. to 4:34 p.m.

Several months later, on April 21, 2021, he reposted the images on his Instagram account.   Exhibit 7.   When he reposted the images, he inserted the following comment onto one of the images: "Figured I'd post this throwback so you could get a little comparison between the so-called insurrection at the Capitol and the non-stop riots from antifa and black lives matter…Notice any differences?"   Exhibit 7.





Exhibit 7

On February 5, 2021, Barnhart took to his Instagram account and posted a statement of

facts that supported a complaint which charged another January 6 defendant.   Exhibit 8.

Barnhart then mocked that complaint with the following post:

> "Our amazing FBI doing some fine investigative work…decided to do a report on
> these guys even including a completely fake photo…unless of course you think this
> painting is really on the wall in the Capitol building lmao
>
> Like I've said multiple times.   Everything you're being told about this is a lie and
> it will be revealed.
> Yes this is real, the report is real… Sorry but what really happened at the capital is
> being hidden from you.  If you want a link to this report so you can look for
> yourself just ask."

Exhibit 8.



Exhibit 8

## III.     THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned a superseding indictment, charging

twenty-four counts against nine defendants. The indictment charged Barnhart in six of the counts:

- Count Ten: violation of 18 U.S.C. § 111(a)(1) and (b) and § 2 (Assaulting, Resisting, or

Impeding Certain Officers or Employees and Inflicting Bodily Injury or Using a Deadly or

Dangerous Weapon, and Aiding and Abetting);

- Count Fourteen: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement

  During Civil Disorder);

- Counts Twenty-One, Twenty-Two, and Twenty-Three: violations of 18 U.S.C. §§

  1752(a)(1), (2), and (4) (Knowingly Entering or Remaining in any Restricted Building or

  Grounds, Disorderly and Disruptive Conduct in any Restricted Building or Grounds, and

  Engaging in Physical Violence in any Restricted Building or Grounds);

- Count Twenty-Four: violation of 40 U.S.C. § 5104(e)(2)(F) (Violent Entry and Disorderly

  Conduct on Capitol Grounds).

On, September 28, 2022, Barnhart pleaded guilty, pursuant to a plea agreement, ECF No.

234, to Count Ten, the assault of Officer B.M.

## IV.    STATUTORY PENALTIES

Barnhart now faces sentencing on one count of violating 18 U.S.C. § 111(a)(1) and (b).

As noted in the Plea Agreement and the Presentence Report issued by the U.S. Probation Office,

Barnhart faces up to 20 years of imprisonment, a term of supervised release of not more than three

years, a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense, and a

mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.   U.S. Probation Office and Government's Guideline Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).   The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[13] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | **+3** |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; | **+6** |
| | Application of Chapter 2, Part A of U.S.S.G. | |
| U.S.S.G. § 3A1.3 | Restraint of the Victim | **+2** |
| | **Adjusted Offense Level:** | **27** |
| U.S.S.G. § 3E1.1(a)-(b) | Acceptance of Responsibility | **<u>-3</u>** |
| | **Total Offense Level:** | **24** |

*See* PSR ¶¶ 54-65; Plea Agreement, ¶ 5.

The U.S. Probation Office calculated Barnhart's criminal history as category I, which is not disputed.  PSR ¶ 70.  Accordingly, the U.S. Probation Office calculated Barnhart's total adjusted offense level, following a three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), as 24, and his corresponding Guidelines imprisonment range as 51-63 months.   PSR at ¶ 118.

The Plea Agreement tracks the Guidelines calculations set forth in the PSR but allows Barnhart "[t]o challenge the application of U.S.S.G. § 3A1.3 solely on the grounds that his offense did not involve the victim being physically restrained in the course of the offense." Plea Agreement, at ¶ 4(A).  For the reasons set for below, the facts of this case firmly support the application of that enhancement.   While Barnhart did not file a formal objection to PSR, defense counsel has informed the government that Barnhart will argue that the enhancement for restraint of a victim under Section 3A1.3 is not applicable in this case.   That argument is wrong.

---

[13] § 2A2.2 applies here because Barnhart's conduct involved aggravated assault.  *See* U.S.S.G. § 2A2.4(c)(1).

**B.  The Restraint of the Victim Enhancement Pursuant to U.S.S.G. § 3A1.3 is Proper**

The Guidelines provides for a two-level, victim-related upward adjustment "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3.  "'Physically restrained' means the forcible restraint of the victim *such as* by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(L) (emphasis added).  "[T]he use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1… indicates that the illustrations of physical restraint are listed by way of example rather than limitation.").  *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) (quoting *United States v. Anglin,* 169 F.3d 154, 163 (2d Cir. 1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Ninth, and D.C. Circuits).

The federal Courts of Appeals have adopted varying approaches to determining whether the victim was "physically restrained" for purposes of Section 3A1.3.  *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh, and Ninth Circuits).  The Third Circuit recently developed an approach incorporating various considerations adopted by other Courts of Appeals, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here").  The five factors identified by the Third Circuit in *Bell* are: (1) use of physical force; (2) exerting control over the victim; (3) providing the victim with no alternative but compliance; (4)

focusing on the victim for some period of time; and (5) placement in a confined space. *Id.*[14]
These factors should be balanced, and no single factor is dispositive.   *Id.*

    1.  <u>Barnhart used physical force against Officer B.M.</u>

    "[P]hysical restraint requires the defendant either to restrain the victim through bodily
contact or to confine the victim in some way."   *Drew*, 200 F.3d at 880 (finding no physical
restraint pursuant to U.S.S.G. § 3A1.3 where the defendant ordered his victim to leave her
bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language
plainly recites, be physical") (citing *United States v. Harris*, 959 F.2d 246, 265 (D.C. Cir. 1992)
*abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)).   Here,
Barnhart made direct bodily contact with Officer B.M. when he grabbed the officer's tactical vest
and dragged him away from the police line in the Archway, down the steps into a violent mob
where other rioters assaulted him.

    Similar kinds of bodily contact have been found to involve physical restraint under the
Guidelines.   *See, e.g., United States v. Plenty*, 335 F.3d 732, 735–36 (8th Cir. 2003) (Section
3A1.3 victim restraint adjustment applied where the defendant dragged the victim by her ankle
from her bedroom to her living room, and then dragged her by her hair to the doorway of the
house); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) (defendant forcibly

---

[14]  The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to
U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate
commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G.
§ 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was
physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline
imposes an additional requirement that the restraint must be imposed "to facilitate commission of
the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter
2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see
Bell*, 947 F.3d at 54–55), *Bell* and similar cases help interpret the meaning of "physically
restrained."

restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back, pretending it was a gun); *see also United States v. West*, No. 20-3723, 2022 WL 321136, at *1 (8th Cir. Feb. 3, 2022) (unpublished) (§ 3A1.3 restraint enhancement was applicable when defendant grabbed the victim around the neck to prevent the victim from leaving the hotel room).

Barnhart's conduct falls within even the narrowest interpretation of restraining the victim through "bodily contact."

    2.   Barnhart exerted control over Officer B.M.

To restrain, a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner. *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted); *Foppe*, 993 F.2d at 1452–53 ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls… 'Forcible' means effected by the use of force") (internal citations omitted); *see, e.g., United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990) ("We have no difficulty in concluding that a victim who is held around the neck at knifepoint is denied freedom of movement so as to be physically restrained [pursuant to § 3A1.3].").  Dragging a victim from one location to another while they struggle to break free and escape forcibly denies the victim such freedom of movement. *See, e.g., Plenty*, 335 F.3d at 736 (defendant "exercise[ed] control over [the victim] that prevented her freedom of movement when he dragged [her] off the bed and through the house").

Here, Barnhart restricted Officer B.M's freedom of movement by dragging him in a prone position over the body of another officer, out of the Archway, down the stairs and into the midst

of a violent mob.   Barnhart's actions prevented Officer B.M. from being able to defend himself

or return to the safety of his fellow officers still holding their line in the Archway.   Accordingly,

Barnhart restricted Officer B.M.'s freedom of movement and exerted control over Officer B.M.

3.   Barnhart provided Officer B.M. with no alternative but compliance.

In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the

application of a Chapter 2 enhancement for the use of physical restraint in a robbery where the

defendant stood on his victim's throat (pinning him to the ground by his neck) while stealing the

victim's wallet and keys, and the victim "could do nothing about [his] situation because of the

physical restraint." *Id.* at 320-21 (internal citations omitted).

Here, Barnhart's restraint caused Officer B.M. to be vulnerable and prevented Officer

B.M. from defending himself.   Officer B.M. was dragged into the crowd face-down on his torso,

so he was unable to use his arms and legs to defend himself.   Officer B.M. was simultaneously

struck by the rioters when he was dragged, which further limited his ability to defend himself.

Barnhart's restraint forced Officer B.M. to comply with exactly what Barnhart and the riotous

mob wanted—for officers to be dragged away from the police line in the Archway, so that rioters

would have a better chance to successfully enter the Capitol Building.   And like the victim in

*Rosario*, Officer B.M. could do nothing about his situation because of the physical restraint that

was being applied to him.   There is no question that Officer B.M. was in a dangerous and

precarious situation as Barnhart dragged Officer B.M. further away from fellow officers who

could have helped him.   Barnhart left Officer B.M. with no alternative but compliance.

4.   The brief duration of the restraint does not preclude application of the enhancement.

The duration of the restraint, albeit brief, should not dissuade the Court from applying the

enhancement, as sustained restraint is not required.   *See, e.g., United States v. Coleman*, 664 F.3d

1047, 1050–51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Checora*, 175 F.3d 782, 791 ("[W]e conclude that a physical restraint occurred, within the meaning of section 3A1.3, when [two defendants] tackled [the victim] to the ground to prevent his escape… The fact the restraint of [the victim] was brief does not alter our conclusion."); *Foppe*, 993 F.2d at 1452– 53 ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

In any event, even under the Third Circuit's *Bell* analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines. *Bell*, 947 F.3d at 56.   "No single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60.   Here, while Barnhart's restraint of Officer B.M. was brief, context matters greatly.   Not only did Barnhart grab the officer and drag him to another more dangerous location, but this restraint occurred in the middle of a riot—Barnhart's holding and dragging of Officer B.M. left the officer vulnerable to additional assaults as he was surrounded by other hostile rioters.   Thus, although the duration of the restraint was brief, it coincided with the moment when Officer B.M. was most vulnerable.   Consequently, the brevity of the restraint should not preclude application of the enhancement.

5. <u>Barnhart, in conjunction with the rioting crowd, placed Officer B.M. in a confined space.</u>

The final consideration is whether "the perpetrator's act... enclose[es] or confin[es] the victim in a space or with a barrier, actual or threatened." *Bell*, 947 F.3d at 60 (internal quotation marks and citations omitted).

Barnhart dragged Officer B.M. into an angry and violent mob of people who surrounded him and prevented him from escaping.   Such behavior—blocking escape—is also considered in determining that a victim was "physically restrained" pursuant to U.S.S.G. § 3A1.3. For instance, in *United States v. DeLuca*, 138 F.3d 24 (1st Cir. 1998) the court found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]."   The court concluded that the victim was confined even though he was never "tied, bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically restrained' [in U.S.S.G. § lBl.1, comment. (n.1 (i))] are merely illustrative . . . not exhaustive." *Id.* at 39.   Barnhart dragged Officer B.M. to a space where the rioters could successfully confine the officer.

6. <u>Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.</u>

The restraint enhancement should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of the offense itself (*e.g.*, this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint))."   U.S.S.G. § 3A1.3 cmt. n. 2.   In order to determine whether "restraint" is an element of the offense, courts look to the statutory definition of the offense.

*United States v. Benitez-Torres*, 73 F. App'x 78 (5th Cir. 2003) (citing *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996)).   When conducting this inquiry, courts should consider whether "the act of physical restraint 'adds to the basic crime.'" *United States v. Wilson*, 198 F.3d 467, 472–73 (4th Cir. 1999).   Courts "must determine whether the offense *conduct* specifically addressed whether the victim was physically restrained" in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup*, 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe*, 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original).

Here, the only specific offense characteristic under Section 2A2.2 is that for bodily injury under Section 2A2.2(b)(3)(A).   That means that Barnhart's restraint of Officer B.M. is not accounted for by application of Section 2A2.2, or by any other enhancement, for that matter.   *See United States v. Davis*, No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied*, 142 S. Ct. 2767 (2022) (rejecting defendant's contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit has previously upheld application of the victim restraint adjustment under § 3A1.3 when the bodily injury enhancement applied.).

Unlawful restraint of a victim is not an element of 18 U.S.C. § 111(a) and (b).   Section 111(a) criminalizes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" an officer while he is engaged in the performance of official duties.   Not all such assaults include physically restraining a victim.   As noted above, restraint is principally defined as "'to hold back; to check; to hold from action, proceeding, or advancing." *Taylor*, 961 F.3d at 78.   While assault involves some force, it does not necessarily involve restraint.   Physical

force is distinct from qualifying physical "restraint." *Id*. at 78-79 (citing *Rosario*, 7 F.3d at 321 ("mere physical contact with the victim does not inevitably amount to physical restraint")).

For instance, in *United States v. Wilson*, 198 F.3d 467 (4th Cir. 1999) the court upheld the two-level physical restraint enhancement for a carjacking, noting that physical restraint was neither an element of carjacking nor "incorporated into the base offense level for robbery." *Id*. at 472 (4th Cir. 1999). Here, in addition to engaging in other conduct that also constitutes assaults (such as striking at officers using flagpole), Barnhart purposely grabbed, dragged, and held Officer B.M. to get him away from the police line, to force him into the violent mob of rioters, and to keep him away from the help of his fellow officers. Such behavior, calculated not just to hurt the victim but to trap him, justifies application of the restraint enhancement.

The restraint enhancement has been applied in other January 6, 2021 Capitol riot assault cases where defendants were convicted of 18 U.S.C. § 111 offenses. In *United States v. Thomas Webster*, 21-cr-208-APM, Judge Mehta found the enhancement applicable when the defendant tackled an officer on the West Plaza during an assault. Relying on the *Bell* factors, Judge Mehta found that four of those five factors clearly applied. "Mr. Webster clearly used physical force; he exerted control over [the officer] for that period of time he held him down to the ground. [The officer] was in no position other than to comply with that while physical force was being applied. And clearly there was a direct focus on [the officer] for some period of time, so I think that physical restraint applies." Webster Sent. Hrg. Tr. At 20-21.

In *United States v. Albuquerque Head and Kyle Young*, 21-CR-291-ABJ, Judge Berman Jackson applied the restraint enhancement to Head and Young as they dragged another officer out of the Tunnel on the LWT and into the mob where the officer was severely assaulted. Even though defendants Young and Head did not restrain the officer for an extended period of time, the

enhancement was nonetheless applied.   For defendant Young, Judge Berman Jackson stated at the sentencing hearing that "[h]e used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm…. The fact that he was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio.")   Young Sent. Hrg. Tr. At 8-11.

As in *Webster* and *Head and Young*, the restraint enhancement is applicable in this case. Any objection by Barnhart should be overruled.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Barnhart's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Barnhart and his co-defendants were some of the first assailants on the LWT to start what became a prolonged, multi-assailant attack on police officers, and which resulted in injury to those officers, including serious injuries.   Barnhart dragged Officer B.M. out of the police line and into the mob of rioter where Officer B.M. was further assaulted.   Not only did Barnhart's action subject Officer B.M. to assault, it left other officers in the police line vulnerable to the mob of rioters.   After his assault on Officer B.M., Barnhart continued his assault on police by charging at the line of officers and striking officers with a flagpole.

The nature and circumstances of Barnhart's offense were of the utmost seriousness and

fully support the government's recommended sentence of 63 months' incarceration.

### B. Barnhart's History and Characteristics

Barnhart has three criminal convictions and additional arrests.   PSR ¶¶ 67-72.   Although the convictions were only for misdemeanors, they demonstrate a troubling relationship with riotous behavior and violence.   Barnhart was previously involved in a riot where he set a vehicle on fire. PSR ¶ 67.   After the fire was extinguished, he kicked the vehicle, assisted in tipping it over on its roof and then got on top of the vehicle and jumped on it. *Id.*   Years later, Barnhart was involved in a road rage incident that culminated when Barnhart exited his vehicle with a semi-automatic handgun and confronted another driver.   PSR ¶ 69.   Barnhart hit the other driver in his face and then left the scene. *Id.*   Barnhart was also convicted of operating a vehicle under the influence. PSR ¶ 68.   In addition to those convictions, Barnhart had additional prior contacts with law enforcement.   See PSR ¶¶ 73-75.   Finally, Barnhart, as demonstrated by his social media, was proud of his actions on January 6.   This history also weighs in favor of a term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Barnhart assaulted multiple officers in the midst of a riot and attack on the U.S. Capitol Building and grounds.   Barnhart's actions are the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[15]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration.   Barnhart's actions on January 6 were deliberate and dangerous.   *See* Sections II(B) and IV(A) *supra*.   Barnhart's lack of remorse at any time following January 6, 2021 demonstrates the need for specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

---

[15]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide useful comparisons to the relevant sentencing considerations in this case.

*United States v. Justin Jersey*, 21-cr-35-RC.   Justin Jersey, one of Barnhart's co-defendants, charged at and attacked the police line in the Archway.   Jersey viciously assaulted Officer A.W. by grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters.   Jersey eventually obtained a police baton and used it to strike at the other officers in the line.   After retreating back into the crowd, Jersey remained in the area and collected

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

the helmet of the officer he had brutally knocked down as a trophy.   Officer A.W. sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault.   Jersey's assault of Officer A.W. reignited other rioters' violent assaults against police.   For Jersey, the Court determined that the defendant's total offense level was 24 and criminal history category was I, resulting in a Guidelines range of 51 to 63 months' imprisonment.   The Government recommended a sentence of 63 months' imprisonment.   The Court imposed a Guidelines range sentence of 51 months' incarceration.

*United States v. Head and Young*, 21-cr-21 (ABJ).   Head and Young both participated in an assault of another MPD officer in the Tunnel and on the LWT at 3:18 p.m., approximately one hour before Barnhart's assault of Officer B.M. Young entered the Tunnel at approximately 2:43 p.m., just after rioters first attempted to breach the Capitol at that location, and participated in the rioters' efforts to force their way into the Tunnel.   Young provided another rioter with a taser and showed that rioter how to use it.   He also directed a strobe light at the police line, threw an audio speaker towards officers (striking another rioter), and jabbed a long stick towards the police line.

Head entered the Tunnel slightly later, at approximately 3:07 p.m., after pushing his way through the crowd on the LWT to get to the Archway.   Head put on a gas mask that a fellow rioter handed him and fought to get to the front of the mob until he was directly up against the police line, where he pushed a riot shield into the line for several minutes.   At approximately 3:18 p.m., Head grabbed MPD Officer M.F. around the neck and pulled him off of the police line, into the crowd of rioters in the Tunnel and on the LWT, yelling "Hey!   I got one!"   There, Officer M.F. was assaulted by multiple individuals, including a rioter who tased the back of his neck and Young, who restrained Officer M.F. by the wrist.   Young them moved towards another officer who has been pulled into the crowd, USCP Officer M.M., and assaulted him, grabbing at his helmet and

body, pushing him, and hitting him, while Head continued to try to assault Officer M.F.   Young and Head each pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).

The Court determined that Young's total offense level was 24[17] and criminal history category was IV, resulting in a Guidelines range of 77-96 months' imprisonment.   The Government recommended a sentence of 86 months' imprisonment.   The Court imposed an 86-month prison sentence on Young.   The Court determined that Head's total offense level was 24 and criminal history category was VI, resulting in a Guidelines range of 96 months' imprisonment.[18]   The Court imposed a 90-month prison sentence on Head.

Barnhart's assault on Officer B.M. at the LWT Tunnel is highly similar and as horrific as Head and Young's assault of Officer M.F.[19]   Each involves officers who were singled-out and pulled off of the police line, separating them from their fellow officers and leaving them vulnerable to an angry, assaultive mob.   Like Head and Young, Barnhart maneuvered himself to the front of the crowd, grabbed an officer, and dragged the officer into the mob, where the officer was assaulted.

## VII.   RESTITUTION

As agreed to by the parties, the Court should order Barnhart to pay $2,000 to the Architect of the Capitol.   The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

---

[17] As previously discussed, both Young and Head received an additional two points due to their restraint of Officer M.F. pursuant to U.S.S.G. § 3A1.3.   However, because each was convicted of a violation of 18 U.S.C. § 111(a), they did not receive a two-point enhancement pursuant to U.S.S.G. § 2A2.2(b)(7).

[18] Head's range of 100-125 months was capped by the 8-year statutory maximum sentence for a violation of 18 U.S.C. § 111(a).

[19] Indeed, both Head and Young's offense level – 24 – is the same as Barnhart's; only their more significant criminal histories resulted in higher Guidelines ranges.

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Barnhart must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[20] Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55"[21] in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 137.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of incarceration of 63 months, three years of supervised release, $32,165.65 in

---

[20] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[21] As noted above, the Government's current estimate of the damages caused by the riot on January 6 is more than $2.8 million.

restitution, and the mandatory $100 special assessment for the count of conviction

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     Colleen D. Kukowski
        Colleen D. Kukowski
        Assistant United States Attorney

        Benet J. Kearney
        Assistant United States Attorney

        Matthew Moeder
        Assistant United States Attorney

        601 D Street, N.W.
        Washington, D.C. 20530
        Colleen.Kukowski@usdoj.gov / (202) 252 2646
        Benet.Kearney@usdoj.gov / (212) 637 2260
        Matthew. Moeder@usdoj.gov / (816) 426-4103