## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **MASON J. COURSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mason Courson to a term of incarceration of 87 months, three years of supervised release, $2,000 in restitution, a $34,776 fine, and the mandatory $100 special assessment for the count of conviction.

### I.   INTRODUCTION

The defendant, Mason Courson, a twenty-seven-year-old from Tamarac, Florida, violently participated in the January 6, 2021 attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers -- including an officer that Courson injured by striking him with a police baton -- and resulted in more than 2.8 million dollars in losses.[1]

Courson was a repeated and prolonged participant in violent acts on the Lower West

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol Building and grounds and certain costs borne by the United States Capitol Police.

Terrace ("LWT") of the United States Capitol Building.   Courson was an initial member of the mob that forcibly entered an archway (the "Archway") that provided access to the interior U.S. Capitol Building from the LWT via a passageway (the "Tunnel").   Over the course of several minutes, Courson made his way deeper into the Tunnel and, along with other rioters, forcefully pushed and shoved the crowd towards the police line stationed in the Tunnel.   As Courson was pushed out of the Tunnel, he reached towards officers and grabbed at their equipment, including a police riot shield and helmet.   The officers were eventually able to push Courson and other rioters out of the Tunnel.   While on the steps outside the Tunnel, Courson armed himself with a police baton.

Approximately an hour later, Courson and numerous other rioters attacked a line of police officers who were positioned in the Archway.   Courson's co-defendants dragged an officer down a set of stairs into the horde of rioters.   There, Courson struck the officer with the baton, causing bodily injuries.   As this officer attempted to ascend the steps back to the police line, Courson and others pushed him back down the steps and prevented him from re-joining the line.

Other rioters surrounding Courson continued assaulting the line of officers in the Archway by slamming riot shields into them, striking them, and throwing objects at them.   After assaulting the officer with the baton, Courson ascended the steps to the Archway and attempted to grab another officer who was still on the ground fending off the attacks.

Because of Courson's prolonged and at times vicious attacks on the police, the Government recommends that the Court sentence Courson to 87 months' incarceration for his conviction of violating 18 U.S.C. § 111(a) and (b), a sentence at the top of the advisory Guidelines range of 70 to 87 months, which the Government submits is the correct Guidelines calculation.   Such a sentence would properly account for Courson's violent criminal conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The Government refers the Court to the Presentence Investigation Report (PSR) for a short

summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an

effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

> ### *Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*
>
> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the most violent confrontations on January 6, 2021 occurred near an entrance to

the Capitol Building on the LWT.   The entrance usually consists of a flight of stairs leading to a

doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the

stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the

"Tunnel").   That tunnel led to two sets of metal swinging doors inset with glass.   On the other

side of the two sets of swinging doors is a security screening area with metal detectors and an x-

ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the

Tunnel is framed by a stone archway -- the "Archway" -- that is a visual focal point at the center

of the West Front of the Capitol Building, as circled in red below.



*Exhibit 1*[2]

On January 6, 2021, when rioters arrived at the doors behind the Archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m. the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items.   Officers created a line in the doorway to block the rioters and in

---

[2] Exhibit 1 is taken from "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

turn used physically engaged them with batons and OC spray.

The violent battle for control over the LWT entrance in the Tunnel and doorway area continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers, engaging them in intense hand-to-hand combat. Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential members of Congress.

**B.      Mason Courson's Role in the January 6, 2021 Attack on the Capitol**

At approximately 3:00 p.m., USCP and MPD officers were positioned in the Tunnel to prevent the advancing mob from entering the Capitol Building.   At approximately 3:15 p.m., Courson entered the Tunnel.   Exhibit 2A.   Over the course of several minutes, Courson made his way deeper into the Tunnel and closer to the entrance into the building.   Along with other rioters, Courson forcefully pushed and shoved the crowd towards the police officers who were positioned in the Tunnel attempting to keep rioters from advancing closer to the interior of the Capitol building.   Exhibits 2B and 2C.   At approximately 3:18 p.m., police officers advanced and forced rioters out of the Tunnel, through the Archway, and onto the steps of the LWT of the Capitol building.   As this occurred, an MPD officer was pulled from the police line by another rioter and dragged through the Tunnel out onto the steps, where he was assaulted by multiple rioters.   As Courson was pushed out of the Tunnel, he reached towards other officers and grabbed at their equipment, including a police riot shield and helmet.   Exhibit 2D.   The officers were eventually

able to push Courson and other rioters out of the Tunnel.   Courson is circled in red in Exhibit 2A, 2B, 2C, and 2D.



*Exhibit 2A (~3:15:34 pm)*



*Exhibit 2B (~3:15:37 pm)*



*Exhibit 2C (~3:17:27 pm)*



*Exhibit 2D (~3:18:45 pm)*

After he was forced out of the Tunnel, Courson remained on the LWT and armed himself

with a baton that a police officer likely dropped during the melee.  Courson is depicted on an

open-source video raising the baton above his head.   *See* Exhibit 3, 3A.[3]



*Exhibit 3A*

Instead of leaving the Capitol grounds, Courson remained as the situation became more volatile.   Approximately an hour later, police officers had been defending the Tunnel for nearly two hours and were attempting to expel a mass of rioters from the Tunnel and the Archway.

Starting at approximately 4:26 p.m., Courson and his co-defendants took part in a brutal 90-second group assault on Officers A.W., B.M., and C.M., who were positioned near the front of the Archway.   The situation escalated considerably when co-defendant Justin Jersey moved toward the front of the crowd and charged at the line of officers that were positioned in the Archway.   Jersey grabbed Officer A.W.'s baton with one hand and reached towards Officer

---

[3] Exhibit 3 is a one-minute clip from an open-source video titled "FULL FOOTAGE Patriots STORM U.S. Capitol" that was posted on the internet. The full video is one hour and twenty-five minutes long and contains footage from the LWT after Courson was expelled from the Tunnel. Starting at :29 seconds in Exhibit 3, Courson is depicted lifting the baton above his head.   Exhibit 3A is a still image from Exhibit 3.

A.W.'s face and knocked him to the ground.   While Officer A.W. was lying on the ground of the

Archway, co-defendant Jack Wade Whitton leapt over a fence, kicked at Officer A.W. and then

struck Officer B.M. and other officers with a crutch multiple times.   With the commencement of

those assaults, other rioters surged towards the Archway, throwing objects at the officers, and

striking at them with makeshift weapons such as a baton, a hockey stick, a piece of wood,

flagpoles, and a police riot shield.   *See* Exhibit 4 at 00:30-1:00.[4]

As Whitton was striking Officer B.M., co-defendants Logan Barnhart and Jeffrey Sabol

ascended the steps leading to the Archway and approached Officer B.M.   *See* Exhibit 4 at 00:49-

00:59.   As a result of Whitton's assault, Officer B.M. fell to the ground.   Courson was positioned

at the bottom of the steps and was wielding a baton at this time. *See* Exhibit 4 and Exhibit 4A.



*Exhibit 4A (a still image from Exhibit 4) (Courson is circled in red, Sabol is circled in gray,
Jersey is circled in green, Whitton is circled in orange, and Barnhart is circled in yellow.)*

---

[4] Exhibit 4 is video footage captured by an individual located on the south side of the LWT.



*Exhibit 4B (a still image from Exhibit 4) (Courson is circled in red, Sabol is circled in gray, Jersey is circled in green, Whitton is circled in orange, and Barnhart is circled in yellow.)*

Whitton then grabbed Officer B.M., first by his baton, then by the helmet and neck of the officer's ballistic vest.   *See* Exhibit 5 at 16:27:25 – 16:28:30; Exhibit 5A.[5]   Barnhart then reached through Whitton's arms and grabbed the neck of Officer B.M.'s ballistic vest. Barnhart and Whitton then dragged Officer B.M. headfirst over Officer A.W., out of the police line and away from the Archway, down the steps in a prone position and into the crowd. Sabol assisted in dragging Officer B.M. down the stairs.



*Exhibit 5A (a still image from Exhibit 5) (Barnhart is circled in yellow, Whitton is circled in orange, and Sabol is circled in gray.)*

---

[5] Exhibit 5 is footage from the BWC of MPD Officer C.M., who was present in the Archway.

An aerial photograph was taken as Barnhart, Whitton, and Sabol dragged Officer B.M. down the stairs and into the mob.   Exhibit 6.   Eight of the nine defendants in this case are shown in Exhibit 6, which illustrates their proximity to one another as they assaulted the officers.



*Exhibit 6 (Courson is circled in red, McAbee is circled in purple, Barnhart is circled in yellow, Whitton is circled in orange, Barnhart is circled in yellow, Jersey is circled in green, Sabol is circled in gray, Stager is circled in dark blue, and Mullins is circled in light blue.)*

As Officer B.M. was dragged down the steps into the crowd, Courson was positioned at the bottom of the steps and was wielding a baton.   Once Officer B.M. was partway down the steps, co-defendant Peter Stager beat Officer B.M. with a flagpole.   Courson then beat Officer B.M. with a police baton.   Courson's beating of Officer B.M. was captured on Officer C.M.'s body-worn camera. *See* Exhibit 5 at 16:27:40 – 16:28:30; Exhibit 5B.



*Exhibit 5B*



Exhibit 5B (zoomed in)

After Courson and Stager beat Officer B.M., the officer eventually was able to stand upright and attempted to climb the steps to re-join the other officers in the Archway.   Courson and co-defendant Clayton Mullins, then each pushed Officer B.M.'s head, causing Officer B.M. to stumble back into the crowd.   *See* Exhibit 4C.   When Officer B.M., was trapped in the crowd of rioters, co-defendant Michael Lopatic stole Officer B.M.'s body worn camera.



*Exhibit 4C (a still image from Exhibit 4). (Officer B.M. is circled in white, Mullins is circled in light blue, and Courson is circled in red.)*

After assaulting Officer B.M. with the baton, Courson ascended the steps to the Archway. Courson then attempted to grab Officer A.W., who was still on the ground fending off the attacks. *See* Exhibit 7, 7A.[6]



*Exhibit 7A (Courson is circled in red, McAbee is circled in purple.)*

While Officer A.W. was on the ground, his helmet was knocked off and Sabol stole his baton. After Whitton, Barnhart, and Sabol dragged Officer B.M. over Officer A.W. into the mob, Other members of the mob then joined in the assault on Officer A.W. Co-defendant Ronald Colton McAbee grabbed at Officer A.W.'s torso, while co-defendant Clayton Ray Mullins grabbed Officer A.W.'s leg and the two engaged in a tug-o-war with officers who were trying to pull Officer A.W. back into the Archway. Eventually, McAbee pulled Officer A.W. out of the Archway and the two slid down a set of stairs and into the crowd together, with McAbee on top of Officer A.W. and pinning Officer A.W. down. As he was dragged into the mob, Officer A.W. was kicked, struck with poles, and stomped on by several individuals. Additionally, Officer A.W. recalled

---

[6] Exhibit 7 is footage from the BWC of MPD Officer A.W.

being maced once his gas mask was ripped off.   When a third officer, Officer C.M., stepped out of the Archway in an attempt to come to the aid of Officers A.W. and B.M., he was assaulted by McAbee, then by Lopatic.

### *Officer B.M.'s Injuries*

As a result of the attack, Officer B.M. sustained physical injuries including bruising and abrasions.   In an interview conducted after the assault,[7] Officer B.M. later described his injuries to the Federal Bureau of Investigation ("FBI") as visible bruising to his arms, face, and legs. The bruises were black and blue in color and were sore and painful, consistent with being hit by a metal pipe.   Officer B.M. also had scratches on his knees.   While Officer B.M. did not immediately seek medical attention,[8] and eventually rejoined his fellow officers on the police line, it is clear from video footage that he was physically affected by the assault.   As individuals in the crowd surround him, Officer B.M. appears to have difficulty walking and moving on his own.   Some of the individuals around him support his weight as they attempt to guide him away from the mob. *See* Exhibit 4 at 01:20-02:31.

---

[7] A report of the FBI interview is attached as Exhibit 8.   The Government respectfully requests that it be filed under seal.

[8] Officer B.M was medically treated in the days following January 6 as a part of MPD's standard Assault on a Police Officer (APO) policy, which occurs after an officer has been assaulted.   The medical report is attached as Exhibit 9; the Government respectfully requests that it be filed under seal.

***Courson's Social Media***

Courson's social media posts assisted investigators in identifying him.   Photographs and videos from Courson's Instagram account depict him in Washington D.C. on January 6, 2021. Those images include the following:



*Exhibits 10A and 10B*

***Courson's Arrest and Execution of the Search Warrant at Courson's Residence***

FBI agents arrested Courson at his residence in Tamarac, Florida on December 14, 2021, and conducted a warranted search of that premise.   They identified and seized  the items of clothing Courson wore on January 6, 2021 as well as the police baton that he used in the assault

on Officer B.M.   The baton was in Courson's bedroom near his desk. *See* Exhibit 11, 12, 13.   The

baton measured



*Exhibit 11*



*Exhibit 12*



*Exhibit 13*

During a post-arrest *Mirandized* interview, Courson admitted to traveling to Washington D.C. to attend activities relating to the "Stop the Steal" rally on January 6, 2021.   Following the rally, Courson admitted that he went to the U.S. Capitol and was involved in the riot, which he described as a "warzone" and a "battle."   Courson admitted trying to break through the police line to enter the building.   He also admitted that he struck officers, took a police baton, and used the baton on officers.   He stated that he believed that the officers were "traitors" on that day.

## III.    THE CHARGES

On November 17, 2021, a federal grand jury returned a superseding indictment, charging twenty-four counts against nine defendants. The indictment charged Courson in eight of the counts:

- Count Seven: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);[9]

---

[9] The violation of Section 231(a)(3) charged in Count 7 covers Courson's conduct in and around the Tunnel from approximately 3:15 to 3:18 p.m.

- Count Ten: violation of 18 U.S.C. § 111(a)(1) and (b) and § 2 (Assaulting, Resisting, or Impeding Certain Officers or Employees and Inflicting Bodily Injury or Using a Deadly or Dangerous Weapon, and Aiding and Abetting);

- Count Eleven: violation of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers);

- Count Fourteen: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder);[10]

- Count Nineteen: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count Twenty: Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Count Twenty-Four: Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

On, November 30, 2022, Courson pleaded guilty without an agreement to Count Ten, the assault of Officer B.M. with a baton.  ECF Minute Entry November 20, 2022.  The remaining counts in the superseding indictment against him remain pending.

**IV.    STATUTORY PENALTIES**

Courson now faces sentencing on one count of violating 18 U.S.C. § 111(a)(1) and (b). Courson faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense, and a mandatory special assessment of $100.

---

[10] The violation of Section 231(a)(3) charged in Count 14 covers Courson's conduct on the LWT from approximately 4:27 to 4:29 p.m.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  U.S. Probation Office and Government's Guideline Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[11] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | **+4** |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | **+3** |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; | **+6** |
| | Application of Chapter 2, Part A of U.S.S.G. | |
| | | |
| | **Adjusted Offense Level:** | **29** |
| | | |
| U.S.S.G. § 3E1.1(a)-(b) | Acceptance of Responsibility | **-3** |
| | | |
| | **Total Offense Level:** | **26** |

*See* PSR ¶¶ 48-52.

The U.S. Probation Office calculated Courson's criminal history as category II, which the Government does not dispute.   PSR ¶ 102.   Accordingly, the applicable Guidelines imprisonment range is 70 to 87 months.   PSR at ¶ 102.

### B.  Courson's Objections

After the final PSR was submitted to the Court, Courson raised several objections to the Guideline calculations that are referenced below.   ECF No. 303.   For the reasons set forth, Courson's objections should be denied.

---

[11]  §2A2.2 applies here because Courson's conduct involved aggravated assault.  *See* U.S.S.G. §2A2.4(c)(1).

### i.    U.S.S.G. §2A2.2 Aggravated Assault (Base Offense Level of 14)

In this case, U.S.S.G. §2A2.4 is the applicable starting Guideline section.   However, the cross-reference of §2A2.4(c) applies "[i]f the conduct constituted aggravated assault."   In that phrase, "conduct" refers to all relevant conduct, not simply the conduct underlying the crime for which Courson pled guilty. *See United States v. Valdez-Torres*, 108 F.3d 385, 387–88 (D.C. Cir. 1997).   "Aggravated assault" is defined as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2 cmt. n.1.   Because the assault charged in Count Ten that Courson pled guilty to qualifies as an "aggravated assault" §2A2.2 is applicable, rather than §2A2.4.

U.S. Probation correctly applied §2A2.2 in this case.   First,  Courson's conduct that violated 18 U.S.C. § 111(a)(1) and (b) that he pled guilty to in Count Ten was an "felonious assault."   The Guidelines do not define "assault" or "felonious assault," and sentencing courts have looked to the common law to define "assault" for Guidelines purposes. *See United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010).   Assault encompasses conduct intended to injure another or presenting a realistic threat of violence to another. *See United States v. Dat Quoc Do*, 994 F.3d 1096, 1099 (9th Cir. 2021) (federal common-law assault includes (1) "a willful attempt to inflict injury upon the person of another," or (2) "a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (citations omitted); *Lucas v. United States*, 443 F. Supp. 539, 543-44 (D.D.C. 1977) (individual assaulted police officer, in violation of 18 U.S.C. § 111, where he "forcibly grabbed" the officer; § 111 "includes the lifting of a menacing hand toward the officer,

or shoving him"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979).   Here, Courson assaulted Officer B.M. on two occasions, first by striking the officer with a police baton multiple times after the officer was dragged down the stairs in a prone position, and second by pushing Officer B.M. after the officer got up and attempted to rejoin the police line.   Both instances reflect a "willful attempt to inflict injury upon" the officers.

Second, Courson's assault "involved a dangerous weapon with intent to cause bodily injury." U.S.S.G. §2A2.2, cmt. n.1; *see United States v. Wallace*, 852 F.3d 778, 785 (8th Cir. 2017) ("§2A2.2 may be applied when the offense conduct involves 'a dangerous weapon with intent to cause bodily injury with that weapon.") (cleaned up).   First, a dangerous weapon is, *inter alia*, "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. 1B1.1, cmt. n. 1(E). Here, the metal police baton wielded by Courson against Officer B.M. was such an instrument because it was capable of inflicting death or "serious bodily injury," which is "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. 1B1.1, cmt. n.1 (M).   *See United States v. Koon*, 833 F. Supp. 769, 781 (C.D. Cal. 1993) ("side-handle police baton" used in the beating of Rodney King was a "dangerous weapon), *aff'd in part, vacated on other grounds in part*, 34 F.3d 1416 (9th Cir. 1994), *aff'd in part, rev'd in part*, 518 U.S. 81 (1996); *see also United States v. Johnson*, 199 F.3d 123, 126 (3d Cir. 1999) (baseball bat used during a jewelry store robbery was a "dangerous weapon");

Courson's striking of Officer B.M. with the police baton was accomplished with "intent to cause bodily injury," which is "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. §1B1.1, cmt. n.1(B). There is no other plausible explanation why Courson repeatedly struck Officer B.M. with

the baton other than to injure him. *See United States v. Blackman,* 370 F. App'x 860, 861 (9th Cir. 2010) (not published) (affirming district court's finding that defendant intended to inflict bodily injury when he dragged the victim "off the couch, kicked her, and hit her in the face with her crutch"); Courson's intent is further illustrated by his actions after the baton incident, namely that he pushed Officer B.M. down the stairs and prevented the officer from escaping the situation.   In his post-arrest interview, Courson described the officers present at the Capitol as "traitors," which further demonstrates his contempt towards Officer B.M. and illustrates that Courson intended to cause the officer injury.

Third, Courson's assault was committed with an intent to commit another felony namely, 18 U.S.C. § 231(a)(3) (Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder), which is charged in Count 14 of the superseding indictment.   Here, Courson obstructed and interfered with law enforcement officers by striking and pushing Officer B.M.   and by grabbing at Officer A.W. in the midst of an ongoing civil disorder.   Courson's intent is also demonstrated by his earlier actions in the Tunnel when he, along with others, forcibly pushed against officers in an effort to enter the building.   Moreover, because § 231(a) is a specific-intent crime, *see United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *14 (D.D.C. Feb. 1, 2022), the intent-to-commit-another-felony basis for finding an aggravated assault exists even under a more restrictive approach that would apply the aggravated-assault definition in §2A2.2's commentary only "if a defendant commits another felony that has a specific intent mens rea or if the defendant specifically intended to committee the other felony—*i.e.*, the purposes of the assault was to commit another felony," *United States v. Rodella*, No. 14-cr-2783, 2015 WL 711941, at *31 (D.N.M. Feb. 5, 2015).   A defendant need not be charged with or convicted of a violation § 231(a)(3) in order for the cross-reference to apply.   *See United States v. Thompson*, 60 F.3d 514,

518 (8th Cir. 1995) (§2A2.2, cmt. n.1(D) properly applied where defendant struck a police officer "in order to facilitate [a] robbery"; "that the state robbery charge was subsequently dismissed is irrelevant"); *United States v. Rue*, 988 F.2d 94, 97(10th Cir. 1993) (§2A2.2 properly applied where defendant committed a felonious assault with the "intent to commit another felony," *viz*, possession of contraband, even though the contraband counts were dismissed); *United States v. Robles*, 557 F. App'x 355, 359 (5th Cir. 2014) (not published) (§2A2.2 properly applied where defendant charged at and knocked over a police officer while attempting to escape; assault was committed with the intent to commit the uncharged state-law felony of evading arrest while using a vehicle); *United States v. Ranaldson*, 386 F. App'x 419, 429 (4th Cir. 2010) (not published) (§2A2.2 properly applied where defendant assaulted a police officer with the intent to commit the uncharged state-law felony of intentionally attempting to disarm a law enforcement officer). Other judges on this Court have applied the cross-reference in §2A2.4(c) in analogous circumstances. *See United States v. Leffingwell*, 21-cr-5 (ABJ), ECF No. 53 at 12-24.[12]

The U.S. Probation Officer correctly applied §2A2.2 as the base offense level in this case and Courson's objection should be denied.

### ii.     U.S.S.G. §2A2.2(b)(3)(A) Bodily Injury (+3 Enhancement)

As outlined above, Officer B.M was injured as a result of the assault that occurred on the LWT.   Courson joined other rioters in the assault and repeatedly struck Officer B.M. with a baton after the officer was dragged out of the Archway and down the set of stairs into the mob.   As a

---

[12]     This Court has also applied the §2A2.4(c) cross-reference in the following cases where application of the cross-reference was not disputed:   *United States v. Duke Wilson,* 21-cr-345 (RCL); *United States v. Devlyn Thompson*, 21-cr-461 (RCL); *United States v. Robert Palmer*, 21-cr-328 (TSC); *United States v. Languerand*, 21-cr-353 (JDB); *United States v. Fairlamb*, 21-cr-120 (RCL).

result, Officer B.M. sustained visible, painful, black and blue bruising to his arms, face, and legs and scratches on his knee. *See* Exhibit 8

Section 2A2.2(b)(3)(A) provides for a three-level enhancement if a victim sustained "bodily injury" because of the assault.   As noted above, "bodily injury" is "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."   U.S.S.G. §1B1.1 n.1(B).   The term "significant injury" is open-ended and cannot be exactly defined but should be determined by a factually specific inquiry. *United States v. Lancaster*, 6 F.3d 208, 210 (4th Cir. 1993).

Injuries like Officer B.M.'s injuries have constituted a "bodily injury" under the Guidelines. *See United States v. Jackson*, 918 F.3d 467, 487–88 (6th Cir. 2019) (victim had a "goose egg" lump on his head—as well as scrapes and minor bruises on his arm and shoulder); *United States v. Smith*, 822 F.3d 755, 765 (5th Cir. 2016) (affirming bodily injury enhancement where a bank customer was thrown to the ground from a chair and kicked, and a bank employee sustained bruising and a small amount of hair loss); *United States v. Steele*, 550 F.3d 693, 703 (8th Cir. 2008) (scratches and eye pain were bodily injury); *United States v. Lister*, 229 Fed. App'x. 334, 340 (5th Cir. 2007) (not published) (cuts and bruises were bodily injury even though the victim did not immediately seek medical attention and the medical personnel described the injuries as "superficial" ); *United States v. Hoelzer,* 183 F.3d 880, 882–83 (8th Cir.1999) (bruises to face, chest, and legs were bodily injury); *United States v. Perkins*, 132 F.3d 1324, 1325 (10th Cir. 1997) (defendant knocked the breath out of the victim and caused small lacerations and bruising); *United States v. Greene*, 964 F.2d 911, 911-12 (9th Cir. 1992) (slap to the victim's face caused swelling and pain); *United States v. Fitzwater,* 896 F.2d 1009, 1012 (6th Cir. 1990) (""bank teller hit her head and hip on her teller's drawer in the course of lying down on

the floor during the robbery").   This enhancement has also been applied when police officers sustained injuries like Officer B.M.'s while defending the Capitol on January 6, 2021.   In *United States v. Webster*, the Court applied a three-level bodily injury enhancement "[b]ecause the victim . . . sustained bodily injury, specifically, bruises to his legs and his arms."   *United States v. Webster*, 21 Cr. 208 (APM), ECF No. 124 (Sentencing Transcript) at 19-20.   *See also id.* ECF No. 104 (Government Sentencing Memorandum) at 24 (pictures depicting the officer's injuries).

Medical care is not a prerequisite for an injury to be "painful and obvious."   *See United States v. Hamm*, 13 F.3d 1126, 1128 (7th Cir. 1994); *see also United States v. Washington*, 500 Fed. App'x 279, 283 (5th Cir. 2012) (victim was punched, but there was no evidence of physical injury and victim did not seek medical care).

Courson directly assaulted Officer B.M., which contributed to the officer's injuries. Courson is also responsible for Officer B.M.'s injuries inflicted by other rioters under relevant conduct principles pursuant to §1B1.3(a)(1)(A) (aiding and abetting) and pursuant to §1B1.3(a)(1)(B) (in the scope and furtherance of the jointly undertaken criminal activity).   Officer B.M. injuries were painful and obvious.   Courson's contrary assertion is without merit and his objection to the bodily injury enhancement should be denied.

### iii.   U.S.S.G. §3A1.2(a)-(b) Government Official Victim (+6 Enhancement)

The six-level victim related enhancement is proper as Officer B.M. "was a government officer or employee" and the offense of conviction was motivated by such status. U.S.S.G. §3A1.2(a)(1) and (2).   At the time of the assault, Officer B.M. was an MPD officer that was wearing official law enforcement gear and insignia.   *See, e.g.,* Exhibit 6.   MPD officers' job was to protect the Capitol, clear the Tunnel, and prevent rioters from entering the building.   Courson and other rioters engaged in a prolonged assaults against the officers.   In his post-arrest interview,

Courson described the riot as a "warzone" and a "battle" between rioters and the officers, who he described as "traitors."   It is clear that Officer B.M. is an official victim pursuant to §3A1.2 and Courson's conduct against officers that day was motivated by their status.   *See United States v. Salim*, 549 F.3d 67, 76 (2d Cir. 2008) (§3A1.2(a) enhancement properly applied where defendant assaulted victim prison guard in order to "obtain a key that [the victim] possessed only as a result of this status"); *United States v. Sulik*, 929 F.3d 335, 338 (6th Cir. 2019) (§3A1.2(a) enhancement properly applied where defendant sent threatening emails to Member of Congress; victim's official status was at least part of the motivation for the threats, even though defendant claimed he targeted the victim because of his position on immigration); *United States v. Bailey*, 961 F.2d 180, 182 (11th Cir. 1992) enhancement properly applied where defendant robbed the postmistress "because, as a postal employee, she was in possession of money orders and a money order validation machine").

Alternatively, this adjustment applies via §3A1.2(c)(1) because, as explained above, Courson assaulted such officer, knowing or having reasonable cause to believe that a person was a law enforcement officer, during the course of the offense "in a manner creating a substantial risk of serious bodily injury." U.S.S.G. §3A1.2(c)(1) "[N]either the text of nor the commentary to § 3A1.2(c)(1) suggests an intent requirement;" it "requires only that the defendant's conduct 'creat[e] a substantial risk of serious bodily injury' to people that he knew or should have known were law enforcement officers." *United States v. Coleman*, 664 F.3d 1047, 1051 (6th Cir. 2012).

"[F]ederal courts frequently apply the official-victim enhancement when a suspect threatens arresting officers with a dangerous weapon." *United States v. Irving*, 431 F. App'x 513, 515 (7th Cir. 2011) (citing cases). That is what occurred here. The Courts of Appeals have frequently affirmed application of the enhancement where the defendant forcefully strikes, or

attempt to strike, a victim's head with his fists, much less with a deadly weapon as Courson did here. *See United States v. Carter*, 830 F.3d 490, 493 (7th Cir. 2016) ("blow to the head sustained by Officer Lopez created a substantial risk of serious bodily injury."); *United States v. Feeback*, 53 F.4th 1132, 1135 (8th Cir. 2022) (affirming application of §3A1.2(c) where defendant assaulted a prison guard by hitting him in the head, punching him, and trying to bite him); *United States v. Alexander*, 712 F.3d 977, 979 (7th Cir. 2013) ("district court did not clearly err by applying the [§3A1.2(c)] adjustment in this case, in which an adult [defendant] threw two punches aimed at a police officer's head."); *see also United States v. Robinson*, 537 F.3d 798, 802-03 (7th Cir. 2008) (affirming application of §3A1.2(c) enhancement where defendant struggled with arresting officers and repeatedly attempted to draw his loaded gun). Application of the enhancement here would be consistent with, if not required by, the principles the courts have developed. *See generally United States v. Olson*, 646 F.3d 569, 572 (8th Cir. 2011) ("We join those circuits that have concluded that the term "assault" in the Official Victim enhancement is a reference to common-law criminal assault."); *United States v. Pruitt*, 999 F.3d 1017, 1022 (6th Cir. 2021) (applying Model Penal Code 211.1(1) definition of "assault"—which includes "attempts to cause or purposely, knowingly or recklessly causes bodily injury to another" and "attempts by physical menace to put another in fear of imminent serious bodily injury"— to assessment of §3A1.2(c) enhancement); *United States v. Patton*, 927 F.3d 1087, 1100 (10th Cir. 2019) (§3A1.2(c) enhancement properly applied where conspirator shot a police officer; defendant was "otherwise accountable" for that shooting under relevant conduct principles).

Courson's official victim objection should be denied.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Courson's felonious conduct on January 6 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Courson engaged in a prolonged course of violence on January 6. Courson and others were part of efforts where the group slammed into the police line in an attempt to gain entry.   He then joined what became a prolonged, multi-assailant attack on police officers. Courson assaulted Officer B.M. after he was dragged out of the police line and into the mob of rioters, striking the officer with a baton.   As the officer as tried to escape to safety, Couson pushed him, preventing him from reaching the police line from which he'd been pulled.   Courson's post-arrest interview makes clear that he had no remorse for his actions that day as we was battling in a "warzone" and the officers were "traitors" to him.   Indeed, Courson kept the baton as a souvenir of his actions that day.

The nature and circumstances of Courson's offenses were of the utmost seriousness and fully support the government's recommended sentence of 87 months' incarceration.

### B.      Courson's History and Characteristics

Courson's criminal history demonstrates a propensity towards violence and particularly violence against law enforcement officers.   Courson has been arrested for various offenses and been adjudicated guilty of misdemeanor offense and a felony offense.  PSR ¶¶ 60-67.   Since 2013, he has continuously been involved in the criminal justice system.   In 2013, he was arrested for disorderly conduct and resisting arrest in Miami Dade County, Florida. PSR ¶ 60.   Following pretrial diversion, the case was dismissed. *Id*.

In 2015, Courson was arrested for battery, assault on law enforcement officers, resisting arrest, disorderly conduct, and possession of marijuana in Delray Beach, Florida. PSR ¶ 61. Courson, while highly intoxicated, assaulted a bar owner, a security guard, and a responding law enforcement officer who attempted to arrest him.   He yelled a racial epithet at the officer and then shoved his fist in the officer's face.   When the officer attempted to arrest him, he aggressively pulled away and then pushed and shoved the officer causing the officer to fall backwards.   He then fled on foot and when he was apprehended, he punched and kicked the arresting officers.   A police K-9 was eventually deployed to get Courson under control.   Following his arrest, he was transported to the hospital, where he kicked a nurse.   Courson pled guilty to the battery and resisting arrest and surprisingly, was sentenced to probation, which he then violated multiple times.

Courson was also arrested for multiple counts of battery on a law enforcement officer, resisting arrest, disorderly conduct and drug possession in 2015.   He escaped conviction in that case, however.   PSR ¶ 67.

Courson has also been convicted of several non-violent offenses, including grand theft in the third degree, PSR ¶ 62; loitering, PSR ¶ 62; and driving under the influence, PSR ¶ 64.

This history weighs in favor of a term of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Courson assaulted multiple officers in the midst of a riot and attack on the U.S. Capitol Building and grounds.   Courson's actions are the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Courson's actions on January 6 were deliberate and dangerous.  *See* Sections II(B) and IV(A) *supra*.  Courson's lack of remorse at any time following January 6, 2021 demonstrates the need for specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine

---

[13]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide useful comparisons to the relevant sentencing considerations in this case.

### i. Courson's Sentenced Co-Defendants

Two of Courson's co-defendants, Justin Jersey and Logan Barnhart, have been sentenced to 51 and 36 months respectively. Courson is deserving of a more severe sentence for two primary

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

reasons.   First, his conduct on January 6 was more prolonged and more violent as he used a dangerous weapon in the assault on Officer B.M, the specific offense of conviction.   As a result of the severity of Courson's conviction, Courson's sentencing Guideline range is higher.   Second, Courson's criminal history is more aggravating than Jersey and Barnhart's criminal history.

*United States v. Justin Jersey*, 21-cr-35-RC.   Jersey charged at and attacked the police line in the Archway.   Jersey viciously assaulted Officer A.W. by grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters.   Jersey eventually obtained a police baton and used it to strike at the other officers in the line, however, that occurred after his offense of conviction.   Officer A.W. sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault.   Jersey's assault of Officer A.W. reignited other rioters' violent assaults against police.   For Jersey, the Court determined that the defendant's total offense level was 24 and criminal history category was I, resulting in a Guidelines range of 51 to 63 months' imprisonment, lower than Courson's Guidelines range.   The Government recommended a sentence of 63 months' imprisonment.   The Court imposed a Guidelines range sentence of 51 months' incarceration.

Courson's criminal conduct on January 6 was more prolonged than Jersey's conduct. Jersey's assaultive conduct began at 4:27 p.m. and lasted for approximately 90 seconds before he exited the Archway area.   Courson's criminal conduct began much earlier, at approximately 3:15 p.m., when he tried to force entry into the building through the Tunnel by pushing against officers. Courson remained on the LWT for over an hour before he assaulted Officer B.M.   Courson also used a baton in the commission of the assault.   While Jersey also used a baton on January 6, Jersey was not armed with a weapon during his offense of conviction, the assault on Officer A.W., who was Jersey's primary victim.

Courson's criminal history is also far more extensive and serious than Jersey. Jersey's criminal history consisted of a single misdemeanor conviction for disorderly conduct. *See* ECF 275, page 20. In comparison, in the last ten years, Courson has been convicted of a felony and four misdemeanors for serious offenses such as battery, resisting arrest, and grand theft. PSR ¶¶ 60-64

Because of his conduct on January 6 and his criminal history, Courson is deserving of a more serious sentence than Jersey.

*United States v. Logan Barnhart*, 21-cr-35-RC. Barnhart grabbed Officer B.M. and dragged him in a prone position from the police line, out of the Archway, and down a set of stairs into the violent mob, where Officer B.M was then attacked by Courson and others. Barnhart then returned to the police line in the Archway and joined the rioters in charging against the police line. Barnhart then approached the line of officers wielding a flagpole and used it to strike the officers. For Barnhart, the Court determined that the defendant's total offense level was 22 and a criminal history category was I, resulting in a Guideline range of 41 to 51 months' imprisonment,[15] significantly lower than Courson's Guidelines range. The Government recommended a sentence of 63 months' imprisonment. The Court imposed a Guideline range sentence of 36 months' incarceration.

As referenced above, Courson's conduct was more prolonged than Barnhart as Barnhart was involved in the melee on the LWT for a much shorter period. Courson's conduct was also more severe as it involved a weapon. Barnhart's offense of conviction involved dragging Officer B.M. from the line of officers into the mob. Barnhart, unlike Courson, did not use a weapon in

---

[15] The Government sought, but the Court did not apply, an additional 2-point enhancement pursuant to U.S.S.G. § 3A1.3, which would have increased Barnhart's Guidelines range to 51 to 63 months.

the commission of his offense.

Courson's criminal history is also more aggravating than Barnhart's history, which included three misdemeanor convictions for unlawful assembly, driving under the influence, and brandishing a firearm.   ECF No. 284, page 27.   Barnhart's criminal convictions were serious in nature, but his last conviction was in 2010.   *Id*.   Courson, on the other hand, has been arrested and convicted of violent offenses as recently as 2018. PSR ¶¶ 60-65

Because of his conduct on January 6 and his criminal history, Courson is deserving of a more serious sentence than Barnhart.

**ii.     Other Comparable Cases**

*United States v. Head and Young*, 21-cr-21-ABJ.   Head and Young both participated in an assault of another MPD officer in the Tunnel and on the LWT at 3:18 p.m., the same time that Courson was in the Tunnel. Young entered the Tunnel at approximately 2:43 p.m., just after rioters first attempted to breach the Capitol at that location and participated in the rioters' efforts to force their way into the Tunnel.   Young provided another rioter with a taser and showed that rioter how to use it.   He also directed a strobe light at the police line, threw an audio speaker towards officers (striking another rioter), and jabbed a long stick towards the police line.

Head entered the Tunnel slightly later, at approximately 3:07 p.m., after pushing his way through the crowd on the LWT to get to the Archway.   Head put on a gas mask that a fellow rioter handed him and fought to get to the front of the mob until he was directly up against the police line, where he pushed a riot shield into the line for several minutes.   At approximately 3:18 p.m., Head grabbed MPD Officer M.F. around the neck and pulled him off the police line, into the crowd of rioters in the Tunnel and on the LWT, yelling "Hey!   I got one!"   There, Officer M.F. was assaulted by multiple individuals, including a rioter who tased the back of his neck and Young,

who restrained Officer M.F. by the wrist.   Young them moved towards another officer who has been pulled into the crowd, USCP Officer M.M., and assaulted him, grabbing at his helmet and body, pushing him, and hitting him, while Head continued to try to assault Officer M.F.   Young and Head each pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).

The Court determined that Young's total offense level was 24[16] and criminal history category was IV, resulting in a Guidelines range of 77-96 months' imprisonment.   The Government recommended a sentence of 86 months' imprisonment.   The Court imposed an 86-month prison sentence on Young.   The Court determined that Head's total offense level was 24 and criminal history category was VI, resulting in a Guidelines range of 96 months' imprisonment, which is higher than Courson's Guidelines range.[17]   The Court imposed a 90-month prison sentence on Head.

Courson's assault on Officer B.M. at the LWT Tunnel is highly similar and as horrific as Head and Young's assault of Officer M.F. Each involves officers who were singled-out and pulled off the police line, separating them from their fellow officers and leaving them vulnerable to an angry, assaultive mob.

## VII.   RESTITUTION

The Court should order Courson to pay $2,000 in restitution to the Architect of the Capitol. The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat.

---

[16] As previously discussed, both Young and Head received an additional two points due to their restraint of Officer M.F. pursuant to U.S.S.G. § 3A1.3.   However, because each was convicted of a violation of 18 U.S.C. § 111(a), they did not receive a two-point enhancement pursuant to U.S.S.G. § 2A2.2(b)(7).

[17] Head's range of 100-125 months was capped by the 8-year statutory maximum sentence for a violation of 18 U.S.C. § 111(a).

1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As permitted under 18 U.S.C. § 3663(a)(3), Courson should be ordered to pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[18] Courson's sentenced co-defendants Jersey and Barnhart were ordered to pay at least this amount of restitution. The riot at the United States Capitol had caused "approximately $1,495,326.55"[19] in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 137.

## VIII. FINE

Courson's convictions under Sections 111 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1);

---

[18] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[19] As noted above, the Government's current estimate of the damages caused by the riot on January 6 is more than $2.8 million.

*See* U.S.S.G. §5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Courson has raised money in an online campaign through GiveSendGo, a fundraising website. PSR ¶ 96.   As of March 9, 2023, Courson had raised $29,453 through the website. *Id*.   As on June 9, 2023, Courson has raised $34,776 through the website.[20]   One of his accounts describes Courson as a "true patriot" and indicates that the funds are to be used for financial obligations.   Courson should not be able to "capitalize" on his participation in January 6 riot in this way.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of a term of incarceration of 87 months, three years of supervised release, $2,000 in restitution, a $34,776 fine and the mandatory $100 special assessment for the count of conviction.

---

[20]  Courson's GiveSendGo accounts can be found at https://www.givesendgo.com/masonjc and https://www.givesendgo.com/helpsavemason.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:  *Colleen D. Kukowski*
Colleen D. Kukowski
Assistant United States Attorney


Benet J. Kearney
Assistant United States Attorney


Matthew Moeder
Assistant United States Attorney

601 D Street, N.W.
Washington, D.C. 20530
Colleen.Kukowski@usdoj.gov / (202) 252 2646
Benet.Kearney@usdoj.gov / (212) 637 2260
Matthew.Moeder@usdoj.gov / (816) 426-4103