**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21 Cr. 35 (RC)** |
| **JACK WADE WHITTON** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

*"I fed [a police officer] to the people."*

On January 6, 2021, the defendant, Jack Wade Whitton, seized the opportunity for violence on the Lower West Terrace of the United States Capitol building and attacked the line of police officers guarding an entrance to the building, igniting an eruption of mayhem and violence that other rioters quickly joined. Whitton brutally assaulted one of the officers by repeatedly striking him with a metal crutch, and then, in his own words, "fed him to the people" by dragging the officer head-first and face-down into the violent, angry mob of rioters, where he was beaten. Whitton also kicked another fallen police officer. But these were not Whitton's only acts of violence on January 6. Whitton returned to this same area approximately twenty minutes later, kicked at the line of officers, and threatened them. At another point, he also attempted to scale a wall to reach a terrace on which a line of police officers was positioned. As he did so, he threw an object at the officers, and attempted to strike them.

For the reasons set forth herein, the government requests that this Court sentence Whitton to a term of incarceration of 97 months – the top of the guideline range as calculated by the Government and the United States Probation Office – three years of supervised release, $2,000 in

1

restitution, a $61,685 fine, and the mandatory $100 special assessment for the count of conviction.

## I.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 226, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

> ### *Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*
>
> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

Many of the of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel").  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the Tunnel is framed by a stone archway (the "Archway") that is a visual

focal point at the center of the West Front of the Capitol Building, as circled in red below.



*Exhibit 1*[1]

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the

---

[1] Exhibit 1 is taken from "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

second set of doors, physically engaging police with batons, poles, chemical spray, bottles, and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for more than two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers, engaging them in intense hand-to-hand combat. Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

**B.      Jack Wade Whitton's Role in the January 6, 2021 Attack on the Capitol**

*Assault of MPD Officers B.M. and A.W. on the Lower West Terrace*

By 4:27 p.m., police officers had been defending the Tunnel for nearly two hours, advancing and retreating as rioters fought their way into the Tunnel, and were yet again attempting to expel rioters from the Tunnel and the Archway.  The crowd of rioters was crushed against the line of police officers protecting the Archway.  As rioters tumbled out of the Tunnel and made their way down a set of steps, Whitton worked his way through (and against) the crowd in order to get closer to the police line in the Archway.  *See* Exhibit 2[2] at 00:00-00:32.

---

[2] Exhibit 2 is video footage captured by an individual located on the south side of the LWT.



*Exhibit 2 at 00:07*

*Exhibit 2 at 00:15*

*Exhibit 2 at 00:26*

*Exhibit 2 at 00:30*

*Whitton (circled in orange) moves through the crowd towards the Archway*

MPD Officers B.M. and A.W. were positioned at the front of the Archway.  As Whitton approached, he pulled a metal crutch from the crowd, raised it over head, and thrust it repeatedly at the police line, striking Officer B.M. and others.  While Whiton was hacking at the line of officers with the crutch, another rioter – co-defendant Justin Jersey – grabbed Officer A.W.'s face,

knocking him onto his back on the ground.  Still wielding the crutch, Whitton climbed over a fence at the top of the stairs.  *See* Exhibit 2 at 00:25-00:50; Exhibit 3[3] at 00:51-01:13; Exhibit 4[4] at 00:23-00:33; Exhibit 5[5] at 00:55-01:15.



*Exhibit 6*
*Whitton leads the assault, striking Officer B.M. with a crutch*

---

[3] Exhibit 3 is video footage captured by an individual located in the crowd on the north side of the LWT.

[4] Exhibit 4 is video footage captured by an individual located in the crowd on the south side of the LWT.

[5] Exhibit 5 is video footage captured by an individual located in the crowd on the north side of the LWT.

It is clear from video footage of the LWT during these assaults that it was Whitton's attack on the police line from the south, along with Jersey's contemporaneous attack on Officer A.W. from the north, that ignited the rageful onslaught of violence that followed.  As Whitton and Jersey commenced their assaults, the tenor of the crowd audibly changed.  *See, e.g.,* Exhibit 2 at 00:30-00:40; Exhibit 5 at 00:55-01:05.  Other rioters surged towards the Archway and joined the attack, throwing objects at the officers and striking at them with makeshift weapons such as a hockey stick, a pieces of wood, a flagpole, and a police riot shield.

As Whitton approached the police line, one of the officers was able to gain control of the crutch.  *See* Exhibit 5 at 01:10-01:15.  Whitton was undeterred.  He continued to fight the officers, grabbing at them with his hands and kicking at them, including at Officer A.W., who was lying on the ground.



*Exhibit 7[6] at 00:48*
*Whitton kicks at Officer A.W.*

---

[6] Exhibit 7 is footage from Officer A.W.'s body-worn camera ("BWC") from approximately 4:26:41 p.m. to 4:28:44 p.m.

Whitton then grabbed Officer B.M.'s baton, and pulled him out of the Archway, over Officer A.W., and towards the mob.  He then grabbed Officer B.M. by the helmet, then by the neck of the officer's ballistic vest, and with assistance from co-defendants Logan Barnhart and Jeffrey Sabol, dragged Officer B.M. head first down the steps and into the crowd.



*Exhibit 7 at 00:51*
*Whitton pulls Officer B.M. by his baton, over Officer A.W.*



*Exhibit 8[7] at 00:34*
*Whitton (circled in orange) pulls Officer B.M. (circled in white) by his helmet into the mob*

---

[7] Exhibit 8 is footage from BWC of Officer C.M. – who was positioned directly behind Officer B.M. -- from approximately 4:26:57 p.m. to 4:28:10 p.m.



*Exhibit 9*
*Whitton (circled in orange), with assistance from Barnhart (circled in yellow)*
*and Sabol (circled in gray) drag Officer B.M. into the mob.*
*(Co-defendants Courson, McAbee, Jersey, Stager, and Mullins are*
*circled in red, purple green, dark blue and light blue, respectively.)*

Once Whitton, Barnhart, and Sabol had dragged Officer B.M. partway down the steps, rioters struck Officer B.M. with objects.  Co-defendant Peter Stager beat Officer B.M. with a flagpole and co-defendant Mason Courson struck Officer B.M. with a stolen police baton.  Officer B.M. was eventually able to stand upright and attempted to make his way back to the Archway, but was prevented from doing so by other rioters.  Officer B.M. was surrounded by members of the mob, some of whom attempted to assault him further and some of whom guided him away from the violence.  *See* Exhibit 10[8] at 01:09-02:31.

Meanwhile, as Officer A.W. lay supine in the Archway, co-defendant Ronald Colton

---

[8] Exhibit 10 is video footage captured by the same individual who filmed Exhibit 2.

McAbee grabbed at Officer A.W.'s torso, while co-defendant Clayton Ray Mullins grabbed Officer A.W.'s leg, and the two engaged in a tug-o-war with officers who were trying to pull Officer A.W. back into the Archway.   Eventually, McAbee pulled Officer A.W. out of the Archway and the two slid down a set of stairs and into the crowd together, with McAbee on top of Officer A.W. and pinning Officer A.W. down.  As he was dragged into the mob, Officer A.W. was kicked, struck with objects, and stomped on by several individuals. Additionally, Officer A.W. recalled being maced once his gas mask was ripped off.   When a third officer, Officer C.M., stepped out of the Archway in an attempt to come to the aid of Officers A.W. and B.M., he was assaulted by McAbee, then by co-defendant Michael Lopatic.

**Whitton Assaults and Threatens MPD Officer D.P. and Other MPD Officers in the Archway**

Approximately 20 minutes later, at 4:48 p.m., Whitton returned to the Archway.  Police officers continued to maintain a line across the entrance to the Tunnel; many were holding riot shields.  Whitton approached the line of officers, gave them the finger, and kicked at them.  *See* Exhibit 11[9] at 00:13-00:22; Exhibit 12[10] at 00:00-00:08.  Another rioter, who was standing between Whitton and the police line yelled at him and others to stop.  Instead, Whitton ran back to the line of officers, kicked at them, striking a riot shield held by Officer D.P., and shouted "you're gonna die tonight!"  *See* Exhibit 11 at 00:38-00:48; Exhibit 12 at 00:27-00:33; Exhibit 13[11] at 01:06-01:12.

---

[9] Exhibit 11 is closed-circuit video from the interior of the Tunnel.

[10] Exhibit 12 is footage from BWC of Officer D.P. – who was positioned in the middle of the Archway -- from approximately 4:48:49 p.m. to 4:49:25 p.m.

[11] Exhibit 13 is footage from BWC of Officer T.C. – who was positioned on the north side of the Archway -- from approximately 4:48:10 p.m. to 4:49:32 p.m.



*Exhibit 12 at 01:09*
*Whitton kicks a riot shield held by MPD Officer D.P.*

**Whitton Scales a Wall in Order to Assault of Police Officers on the Upper West Terrace**

At another point on January 6, Whitton scaled the wall between the LWT and the Upper West Terrace ("UWT") of the Capitol building, where bleachers had been set up for the inauguration and police officers were attempting to clear rioters. Whitton threw an object at the line of officers, then reached over the balustrade to throw a punch at them.

  

*Exhibit 14¹² at 00:26*          *Exhibit 14 at 00:29*          *Exhibit 14 at 00:31*

*Whitton (circled in orange) climbs from the LWT to the UWT,*
*throws an object, and punches at police officers*

### *Officer B.M.'s Injuries*

As a result of the vicious attack, Officer B.M. sustained physical injuries including bruising

and abrasions.  In an interview conducted after the assault, Officer B.M. later described his injuries

to the Federal Bureau of Investigation ("FBI") as visible bruising to his arms, face, and legs. The

bruises were black and blue in color and were sore and painful, consistent with being hit by a metal

pipe.  Officer B.M. also had scratches on his knees.  While Officer B.M. did not immediately seek

medical attention and eventually rejoined his fellow officers on the police line, it is clear from

video footage that he was physically affected by the assault.  As individuals in the crowd

---

¹² Exhibit 14 is video footage captured by an individual located in the crowd on the West Plaza of
the Capitol.  It does not have a timestamp.

surrounded him, Officer B.M. had difficulty walking and moving on his own.  Some of the individuals around him supported his weight as they attempted to guide him away from the mob.  *See* Exhibit 10 at 01:20-02:31.

### Officer A.W.'s Injuries

After he was dragged into the mob, Officer A.W. was able to make his way back to the Archway area.  Once he was back in the Tunnel, another officer realized that Officer A.W. was bleeding from his head.  Officer A.W. was subsequently escorted to the east side of the Capitol building before being taken to the hospital.  At the hospital, Officer A.W. was treated for a laceration on his head which required two staples to close.  He also sustained bruising on multiple areas of his body, including contusions on his elbow, as well as a concussion.  Due to his injuries, Officer A.W. was off duty until May 2021.  At that time, he returned to limited duty, but did not return to full duty until approximately July 2021.

### Whitton's Celebratory Statements

In the days that followed January 6, Whitton texted and posted on social media about his conduct at the Capitol, expressing pride in his participation in assaults and unconcern for his victims.  In one text exchange, sent on the evening of January 6, 2021, Whitton informed an associate that he "didn't actually get in the building but everything else I was in the middle of."  He then sent images of his bloodied hands, stating "This is from a bad cop. . . I fed him to the people.  Idk his status.  And I don't care tbh."[13]

---

[13] "Idk" stands for "I don't know;" "tbh" stands for "to be honest."









*Exhibit 15*

Whitton also posted a picture of his bloodied hand on social media, facetiously stating that a police officer "beat my ass with his face."[14]



*Exhibit 16*

## II.   THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned a superseding indictment, charging twenty-four counts against nine defendants.  The indictment charged Whitton with nine counts:

- Count Nine: violation of 18 U.S.C. § 111(a)(1) and (b) and § 2 (Assaulting, Resisting, or Impeding Officer A.W., Inflicting Bodily Injury, and Aiding and Abetting);

- Count Ten: violation of 18 U.S.C. § 111(a)(1) and (b) and § 2 (Assaulting, Resisting, or Impeding Officer B.M. Using a Deadly or Dangerous Weapon, and Aiding and Abetting);

---

[14] The government obtained this post (Exhibit 16) from an acquaintance of Whitton.  Whitton's Instagram account was taken down prior to his arrest.

- Count Fourteen: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder);

- Count Sixteen: violation of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Officer D.P.);

- Count Seventeen: violation of 18 U.S.C. § 231(a)(3) (Obstruction of Law Enforcement During Civil Disorder);

- Counts Eighteen, Nineteen, and Twenty: violations of 18 U.S.C. §§ 1752(a)(1), (2), (4), and (b)(1)(A) (Knowingly Entering or Remaining in any Restricted Building or Grounds, Disorderly and Disruptive Conduct in any Restricted Building or Grounds, and Engaging in Physical Violence in any Restricted Building or Grounds, with a Deadly or Dangerous Weapon);

- Count Twenty-Four: violation of 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence on Capitol Grounds).

On September 13, 2022, Whitton was convicted of Count Ten based on a guilty plea entered pursuant to a plea agreement.

## III.   STATUTORY PENALTIES

Whitton now faces sentencing on one count of violating 18 U.S.C. § 111(a)(1) and (b).  As noted in the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, Whitton faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense, and a mandatory special assessment of $100.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  U.S. Probation Office and Government's Guideline Calculations

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[15] | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | **+4** |
| U.S.S.G. § 2A2.2(b)(3)(A) | Bodily Injury | **+3** |
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(a)-(b) | Government Official Victim; Application of Chapter 2, Part A of U.S.S.G. | **+6** |
| U.S.S.G. § 3A1.3 | Restraint of the Victim | **+2** |
| | **Adjusted Offense Level:** | **31** |
| U.S.S.G. § 3E1.1(a)-(b) | Acceptance of Responsibility | **-3** |
| | **Total Offense Level:** | **28** |

*See* PSR ¶¶ 52-65; Plea Agreement, ¶ 4A.

The U.S. Probation Office calculated Whitton's criminal history as category I, which is not disputed.  PSR ¶ 69.  Accordingly, the U.S. Probation Office calculated Whitton's total adjusted offense level, following a three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), as 28, and his corresponding Guidelines imprisonment range as 78-97 months.  PSR ¶ 108.

The Plea Agreement tracks the Guidelines calculations set forth in the PSR but allows Whitton "[t]o challenge the application of U.S.S.G. § 3A1.3 solely on the grounds that his offense

---

[15] § 2A2.2 applies here because Whitton's conduct involved aggravated assault.  *See* U.S.S.G. § 2A2.4(c)(1).

did not involve the victim being physically restrained in the course of the offense." Plea Agreement at ¶ 4A.  For the reasons set forth below, the facts of this case firmly support the application of this enhancement.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case, for at least the following reasons: Whitton both used violence and credible threats of violence and used a dangerous weapon in connection with the offense of conviction – assaulting Officer B.M. with a crutch.  *See* U.S.S.G. § 4C1.1(a)(3), (7). The government is aware of at least two cases in which this Court and Chief Judge Boasberg rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC) and *United States v. Baquero*, 21-cr-702 (JEB).

**B. Whitton's Dragging of Officer B.M. from the Archway into the Mob Amounted to Restraint of the Victim, Triggering the Enhancement Pursuant to U.S.S.G. § 3A1.3.**

The Guidelines provides for a two-level, victim-related upward adjustment "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3.  "'Physically restrained' means the forcible restraint of the victim *such as* by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(L) (emphasis added).  "[T]he use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1… indicates that the illustrations of physical restraint are listed by way of example rather than limitation." *United States v. Drew*, 200 F.3d 871, 880 (D.C.

Cir. 2000) (quoting *United States v. Anglin*, 169 F.3d 154, 163 (2d Cir. 1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Ninth, and D.C. Circuits).

The federal Courts of Appeals have adopted varying approaches to determining whether the victim was "physically restrained" for purposes of Section 3A1.3.  *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh, and Ninth Circuits).  The Third Circuit recently developed an approach incorporating various considerations adopted by other Courts of Appeals, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here").  The five factors identified by the Third Circuit in *Bell* are: (1) use of physical force; (2) exerting control over the victim; (3) providing the victim with no alternative but compliance; (4) focusing on the victim for some period of time; and (5) placement in a confined space. *Id*.[16]  These factors should be balanced, and no single factor is dispositive.  *Id*.

---

[16] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of

1.  <u>Whitton used physical force against Officer B.M.</u>

"[P]hysical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *Drew*, 200 F.3d at 880 (finding no physical restraint pursuant to U.S.S.G. § 3A1.3 where the defendant merely ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C. Cir. 1992) *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)).  Here, Whitton made direct bodily contact with Officer B.M. when he grabbed the officer's helmet and tactical vest and dragged him away from the police line in the Archway, down the steps into a violent mob where other rioters assaulted him.

Similar kinds of bodily contact have been found to involve physical restraint under the Guidelines.  *See, e.g., United States v. Plenty*, 335 F.3d 732, 735–36 (8th Cir. 2003) (Section 3A1.3 victim restraint adjustment applied where the defendant dragged the victim by her ankle from her bedroom to her living room, and then dragged her by her hair to the doorway of the house); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) (defendant forcibly restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back, pretending it was a gun); *see also United States v. West*, No. 20-3723, 2022 WL 321136, at *1 (8th Cir. Feb. 3, 2022) (unpublished) (§ 3A1.3

---

the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see Bell*, 947 F.3d at 54–55), *Bell* and similar cases help interpret the meaning of "physically restrained."

restraint enhancement was applicable when defendant grabbed the victim around the neck to prevent the victim from leaving the hotel room).

Here, Whitton's conduct falls within even the narrowest interpretation of restraining the victim through "bodily contact," and is akin to the dragging of the victim by an extremity in *Plenty*.

### 2. Whitton exerted control over Officer B.M.

To trigger the restraint enhancement, a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner. *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (cleaned up); *Foppe*, 993 F.2d at 1452–53 ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls… 'Forcible' means effected by the use of force") (internal citations omitted); *see, e.g., United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990) ("We have no difficulty in concluding that a victim who is held around the neck at knifepoint is denied freedom of movement so as to be physically restrained [pursuant to § 3A1.3].").  Dragging a victim from one location to another while they struggle to break free and escape forcibly denies the victim such freedom of movement. *See, e.g., Plenty*, 335 F.3d at 736 (defendant "exercise[ed] control over [the victim] that prevented her freedom of movement when he dragged [her] off the bed and through the house").

Here, Whitton restricted Officer B.M's freedom of movement by dragging him headfirst in a prone position over the body of another officer, out of the Archway, down the stairs and into the midst of a violent mob.  Whitton's actions prevented Officer B.M. from being able to defend

himself or return to the safety of his fellow officers still holding their line in the Archway. Accordingly, Whitton restricted Officer B.M.'s freedom of movement and exerted control over Officer B.M.

### 3. Whitton provided Officer B.M. with no alternative but compliance.

In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of a Chapter 2 enhancement for the use of physical restraint in a robbery where the defendant stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." *Id.* at 320-21 (internal citations omitted).

Here, Whitton's restraint caused Officer B.M. to be vulnerable and prevented Officer B.M. from defending himself. Officer B.M. was dragged into the crowd face-down and headfirst, so he was unable to use his arms and legs to defend himself. Officer B.M. was simultaneously struck by the rioters when he was dragged, which further limited his ability to defend himself. Whitton's restraint forced Officer B.M. to comply with exactly what Whitton and the riotous mob wanted— for officers to be dragged away from the police line in the Archway so rioters would have a better chance to successfully enter the Capitol Building. And like the victim in *Rosario*, Officer B.M. could do nothing about his situation because of the physical restraint that was being applied to him. There is no question that Officer B.M. was in a dangerous and precarious situation as Whitton dragged him away from fellow officers who could have helped him. As Whitton himself later proclaimed, "I fed him to the people." Whitton left Officer B.M. with no alternative but compliance.

4.   <u>The brief duration of the restraint does not preclude application of the enhancement.</u>

The duration of the restraint, albeit brief, should not dissuade the Court from applying the enhancement, as sustained restraint is not required.  *See, e.g., United States v. Coleman*, 664 F.3d 1047, 1050–51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Checora*, 175 F.3d 782, 791 ("[W]e conclude that a physical restraint occurred, within the meaning of section 3A1.3, when [two defendants] tackled [the victim] to the ground to prevent his escape… The fact the restraint of [the victim] was brief does not alter our conclusion."); *Foppe*, 993 F.2d at 1452– 53 ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

In any event, even under the Third Circuit's *Bell* analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines.  *Bell*, 947 F.3d at 56.  "No single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60.  Here, while Whitton's restraint of Officer B.M. was brief, lasting approximately 10 seconds, context matters greatly.  Not only did Whitton grab the officer and drag him several feet to another, more dangerous location, but this restraint occurred in the middle of a riot—Whitton's holding and dragging of Officer B.M. left the officer vulnerable to additional assaults as he was surrounded by other hostile rioters.  Thus, although the duration

24

of the restraint was not long, it coincided with the moment when Officer B.M. was most vulnerable. Consequently, the brevity of the restraint should not preclude application of the enhancement.

5. <u>Whitton, in conjunction with the rioting crowd, placed Officer B.M. in a confined space.</u>

The final consideration is whether "the perpetrator's act… enclose[es] or confin[es] the victim in a space or with a barrier, actual or threatened." *Bell*, 947 F.3d at 60 (internal quotation marks and citations omitted).

Whitton dragged Officer B.M. into an angry and violent mob of people who surrounded him and prevented him from escaping. Such behavior—blocking escape—is also considered in determining that a victim was "physically restrained" pursuant to U.S.S.G. § 3A1.3. For instance, in *United States v. DeLuca*, 138 F.3d 24 (1st Cir. 1998) the court found that the victim was "physically restrained" by two of the defendant's co-conspirators where one co-conspirator "pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and [another co-conspirator], throughout the encounter, stood at the hallway door barring egress by [the victim]." The court concluded that the victim was confined even though he was never "tied, bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically restrained' [in U.S.S.G. § 1B1.1, comment. (n.1 (i))] are merely illustrative . . . not exhaustive." *Id.* at 39. Whitton dragged Officer B.M. to a space where the rioters could successfully confine the officer and where no other officers could reach him.

6. <u>Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.</u>

The restraint enhancement should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of

25

the offense itself (*e.g.*, this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint)).”  U.S.S.G. § 3A1.3 cmt. n. 2.  In order to determine whether “restraint” is an element of the offense, courts look to the statutory definition of the offense. *United States v. Benitez-Torres*, 73 F. App’x 78 (5th Cir. 2003) (citing *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996)).  When conducting this inquiry, courts should consider whether “the act of physical restraint ‘adds to the basic crime.’” *United States v. Wilson*, 198 F.3d 467, 472–73 (4th Cir. 1999).  Courts “must determine whether the offense *conduct* specifically addressed whether the victim was physically restrained” in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup*, 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe*, 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original).

Here, the specific offense characteristics under Section 2A2.2 are those for (1) use of a dangerous weapon under Section 2A2.2(b)(B) and (2) bodily injury under Section 2A2.2(b)(3). That means that Whitton’s restraint of Officer B.M. is not accounted for by application of Section 2A2.2, or by any other enhancement, for that matter.  *See United States v. Davis*, No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied*, 142 S. Ct. 2767 (2022) (rejecting defendant’s contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit had previously upheld application of the victim restraint adjustment under  § 3A1.3 when the bodily injury enhancement applied.).

Unlawful restraint of a victim is not an element of 18 U.S.C. § 111(a) and (b).  Section 111(a) criminalizes “forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or

interfer[ing] with" an officer while he is engaged in the performance of official duties. Not all such assaults include physically restraining a victim. As noted above, restraint is principally defined as "'to hold back; to check; to hold from action, proceeding, or advancing." *Taylor*, 961 F.3d at 78. While assault involves some force, it does not necessarily involve restraint. Physical force is distinct from qualifying physical "restraint." *Id*. at 78-79 (citing *Rosario*, 7 F.3d at 321 ("mere physical contact with the victim does not inevitably amount to physical restraint")).

For instance, in *United States v. Wilson*, 198 F.3d 467 (4th Cir. 1999) the court upheld the two-level physical restraint enhancement for a carjacking, noting that physical restraint was neither an element of carjacking nor "incorporated into the base offense level for robbery." *Id*. at 472 (4th Cir. 1999). Here, in addition to engaging in other conduct that also constitutes assault – striking at Officer B.M. and other officers with a crutch, kicking at officers, throwing an object and throwing a punch at officers -- Whitton purposely grabbed, dragged, and held Officer B.M. to get him away from the police line, to force him into the violent mob of rioters, and to keep him away from the help of his fellow officers. Such behavior, calculated not just to hurt the victim but to trap him, justifies application of the restraint enhancement.

The restraint enhancement has been applied in other January 6, 2021 Capitol riot assault cases where defendants were convicted of 18 U.S.C. § 111 offenses. In *United States v. Thomas Webster*, 21-cr-208, Judge Mehta found the enhancement applicable when the defendant tackled an officer on the West Plaza during an assault. Relying on the *Bell* factors, Judge Mehta found that four of those five factors clearly applied. "Mr. Webster clearly used physical force; he exerted control over [the officer] for that period of time he held him down to the ground. [The officer] was in no position other than to comply with that while physical force was being applied. And

clearly there was a direct focus on [the officer] for some period of time, so I think that physical restraint applies."  Webster Sent. Hrg. Tr. at 20-21.  Notably, Webster held his victim down for only a few more seconds than Whitton restrained Officer B.M.

In *United States v. Albuquerque Head and Kyle Young*, 21-cr-291, Judge Berman Jackson applied the restraint enhancement to Head and Young as they dragged another officer out of the Tunnel on the LWT and into the mob where the officer was severely assaulted.  Head wrapped his arm around the officer's neck and pulled him off of the police line, through the Tunnel, and out onto the LWT, restraining him for approximately 25 seconds.  There, Young pulled the officer's arm away from his body, preventing him from protecting his service weapon, and held him by the wrist for several seconds while others assaulted him.  With respect to Young, Judge Berman Jackson stated at the sentencing hearing that "[h]e used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm…. The fact that he was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio.")  Young Sent. Hrg. Tr. at 8-11.

This Court has declined to apply the restraint enhancement in the case of Whitton's co-defendant, Logan Barnhart, who also participated in the dragging of Officer B.M. into the mob from the Archway.  While the government believes that the enhancement should apply to both Barnhart and Whitton, Whitton's actions are distinguishable from Barnhart's and warrant application of the enhancement.  *First*, Whitton's restraint of Officer B.M. was more prolonged and more involved.  It was Whitton who first pulled Officer B.M. off of the police line; Barnhart joined him in dragging Officer B.M. down the steps a few seconds later.  *Second*, Barnhart's act

of dragging Officer B.M. into the mob constituted the assault with which he was charged, while Whitton's conduct in restraining Officer B.M. occurred in addition to conduct that separately constitutes an assault – striking Officer B.M. with the crutch.

As in *Webster* and *Head and Young*, the restraint enhancement is applicable to Whitton's conduct.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Jack Wade Whitton's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  Whitton's attack on the police officers in the Tunnel at 4:28 p.m. was brutal and it ignited the series of vicious assaults that occurred on the LWT over the next two minutes.  Whitton was one of the first assailants to commence what became a prolonged, multi-assailant attack on police officers, and which resulted in injury to those officers. And it was Whitton who first pulled Officer B.M. off of the police line, "feeding" him to the mob, where he was beaten by other rioters.  But that attack was not Whitton's only violence that day. He returned to the Archway 20 minutes after the assault of Officer B.M., where he threatened and kicked officers.  He also attempted to climb a wall in order to attack additional police officers.  In the days that followed, Whitton expressed pride rather than remorse, and made light of his conduct.

The nature and circumstances of Whitton's offense were of the utmost seriousness, and

fully support the government's recommended sentence of 97 months' incarceration.

###    B.    Whitton's History and Characteristics

As set forth in the PSR, Whitton has two criminal convictions, both misdemeanors.  He has

one additional arrest. *See* PSR ¶¶ 67-71.

###    C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of

incarceration.  Whitton looked for opportunities to attack:  In his three documented assaults, he

was either a leader or a solitary actor.  And he was unconcerned by the consequences of his actions,

commenting that he did not know about the status of the officer who he had "fed" "to the people"

and didn't care.  Whitton's criminal conduct on January 6 was the epitome of disrespect for the

law.

###    D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[17] The demands of general

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out

of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[17] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration.

First, while perhaps not premediated, Whitton's actions on January 6, 2021 were deliberate and dangerous.  *See* Sections II(B) and IV(A) *supra*.  It is fortuitous that Officer B.M. escaped more serious injury, and certainly was not the result of any moderation on Whitton's part.  Further, his callous disregard for the officers he attacked – even after the fact –  demonstrates a chilling lack of remorse.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).  Indeed, if there was any doubt as to Whitton's intentions on January 6, 2021, he made them clear at 4:49 p.m. when he shouted at the officers in the Tunnel "You're gonna die tonight!"

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[18]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[19]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[18] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[19] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, Whitton's co-defendants are relevant and useful comparators:

*United States v. Justin Jersey*, 21-cr-35-RC.  As discussed above, Jersey charged at and attacked the police line in the Archway.  As Whitton was striking Officer B.M. with a crutch, Jersey was assaulting Officer A.W. by grabbing his face and knocking him to the ground, leaving him vulnerable to attack by other rioters.  These twin assaults reignited other rioters' violent assaults against police after a relative lull.  Seconds later, Jersey obtained a police baton and used it to strike at the other officers in the line.  (This assault, however, occurred after his offense of conviction, the assault of Officer A.W.)  As discussed above, Officer A.W. sustained serious injuries as a result of the attacks on the LWT, including from Jersey's assault.  For Jersey, the Court calculated a total offense level of 24 and criminal history category of I, resulting in a Guidelines range of 51 to 63 months' imprisonment, lower than Whitton's Guidelines range, because no enhancements for the use of a weapon or restraint of victim were applied.  This Court imposed a Guidelines range sentence of 51 months' incarceration.

Whitton's role in igniting a bout of brutal violence on the LWT and causing a police officer to be pulled into the angry mob is similar to Jersey's.  Unlike Jersey, however, in addition to leading the assault, Whitton first used a weapon to strike officers and then himself pulled Officer B.M. into the crowd.  (In contrast, it was McAbee and Mullins who pulled Officer A.W. into the crowd after Jersey's initial attack.)  Nor did Jersey verbally threaten to kill officers or send or post statements celebrating his violent actions on January 6.

*United States v. Logan Barnhart*, 21-cr-35-RC.  After Whitton pulled Officer B.M. off of the police line in the Archway, Barnhart assisted him in dragging B.M. in a prone position down

a set of stairs into the violent mob, where Officer B.M was then attacked by other rioters.  Barnhart then returned to the Archway and joined other rioters in charging against the police line and striking at the officers with a flagpole.  For Barnhart, the Court calculated a total offense level of 22 and criminal history category I, resulting in a Guideline range of 41 to 51 months' imprisonment,[20] significantly lower than Whitton's Guidelines range.  This Court imposed a below-guidelines sentence of 36 months' incarceration, crediting, in part, complications arising from the GPS monitor that Barnhart was required to wear while on pre-trial release and the restrictions that this condition placed on his liberty.

*United States v. Mason Courson*, 21-cr-35-RC.  Courson joined the assault on Officer B.M., striking him with a police baton, then, as the officer attempted to stand up and rejoin the police line, pushing him towards the mob of rioters.  Courson then grabbed at Officer A.W. as he was still lying on the ground.  Approximately one hour earlier, Courson and other rioters forced their way through the line of police officers guarding the Tunnel.  As officers expelled rioters, Courson grabbed at their equipment.  For Courson, the Court calculated a total offense level of 26 and a criminal history category of II, resulting in a Guideline range of 78 to 87 months' imprisonment.  This Court imposed a below-guidelines sentence of 57 months' incarceration.

Both Courson and Whitton wielded weapons and inflicted injury on Officer B.M., and both engaged in other assaultive conduct on January 6.  However, drawing an equivalence between Courson and Whitton overlooks Whitton's crucial role in inciting the assaults on the LWT, as well

---

[20] The Government sought, but the Court did not apply, an additional 2-point enhancement pursuant to U.S.S.G. § 3A1.3, which would have increased Barnhart's Guidelines range to 51 to 63 months.

as Whitton's drive to be at the forefront of violence that day – Whitton consistently pushed through or broke from the crowd in order to lash out at officers and be close to the action.

*United States v. Peter Stager*, 21-cr-35 (RC).  Stager joined the assault on Officer B.M., striking him with a flagpole, then ascended the steps to the Archway and yelled  "Fuck you! Fucking traitor!" at Officer A.W. who was lying on the ground.  Stager was subsequently filmed pointing at the Capitol building and stating "Everybody in there is a disgrace.  That entire building is filled with treasonous traitors.  Death is the only remedy for what's in that building.  .  .  . everybody in there is a treasonous traitor.  Every single one of those Capitol law enforcement officers, death is the remedy, that is the only remedy they get."  For Stager, the Court calculated a total offense level of 26, applying all the same enhancements that apply to Whitton, with the exception of the restraint of victim enhancement, and a criminal history category of I, resulting in a Guideline range of 63 to 78 months' imprisonment.  This Court imposed a below-guidelines sentence of 52 months' incarceration, crediting in part Stager's "horrible" childhood, which he had worked hard to overcome.

While Stager and Whitton both used improvised weapons to strike and injure Officer B.M., and both made menacing statements regarding law enforcement, Stager did not engage in additional violent or assaultive conduct on January 6.  And, as with Courson, any direct comparison between Stager and Whitton's conduct does not take into account Whitton's key role in the assaults on the LWT and elsewhere.

Simply put, Whitton's conduct on January 6, 2021 surpasses that of his co-defendants who have been sentenced to date, and warrants a more significant sentence.

*United States v. Head and Young*, 21-cr-21 (ABJ), discussed above, also provides a relevant comparison to the consideration in Whitton's case.  Head and Young both participated in an assault of another MPD officer in the Tunnel and on the LWT at 3:18 p.m., approximately an hour prior to Whitton's assault of Officer B.M.  Young entered the Tunnel at approximately 2:43 p.m., just after rioters first attempted to breach at that point, and participated in rioters' efforts to force their way into the Tunnel.  Young provided another rioter with a taser and showed that rioter how to use it.  He also directed a strobe light at the police line, threw an audio speaker towards officers (striking another rioter), and jabbed a long stick towards the police line.  Head entered the Tunnel slightly later, at approximately 3:07 p.m., after pushing his way through the crowd on the LWT to get to the Archway.  Head put on a gas mask that a fellow rioter handed him and fought to get to the front of the mob, until he was directly up against the police line, where he pushed a riot shield into the line for several minutes.  At approximately 3:18 p.m., Head grabbed MPD Officer M.F. around the neck and pulled the officer off of the police line, into the crowd of rioters in the Tunnel and on the LWT, yelling "Hey!  I got one!"  There, Officer M.F. was assaulted by multiple individuals, including a rioter who tased the back of his neck and Young, who restrained Officer M.F. by the wrist.  Young them moved towards another officer who has been pulled into the crowd, USCP Officer M.M., and assaulted him, grabbing at his helmet and body, pushing him, and hitting him, while Head continued to try to assault Officer M.F.  Young and Head each pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).

The Court determined that Young's total offense level was 24[21] and criminal history category was IV, resulting in a Guidelines range of 77-96 months' imprisonment.  The Court

---

[21] Both Young and Head received an additional two points due to their restraint of Officer M.F.

imposed a 86-month sentence on Young.  The Court determined that Head's total offense level was 24 and criminal history category was VI, resulting in a Guidelines range of 96 months' imprisonment.[22]  The Court imposed a 90-month sentence on Head.

Head and Young's assault of Officer M.F. bears substantial similarities to the assaults of Officers A.W. and B.M. on the LWT approximately an hour later.  Each involves officers who were singled-out and pulled off of the police line, separating them from their fellow officers and leaving them vulnerable to an angry, assaultive mob.  Like Head, Whitton actively sought to be at the front of the crowd, up against the police line, and therefore ignited the ensuing group assault. And, while Officer M.F.'s injuries more serious than Officer B.M.'s, that is not the result of any restraint shown by Whitton, who, unlike Young and Head, used a weapon to attack Officer B.M.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[23] Generally, restitution under the VWPA must "be tied to the loss

---

pursuant to U.S.S.G. § 3A1.3.  However, because each was convicted of a violation of 18 U.S.C. § 111(a), they did not receive a two-point enhancement pursuant to U.S.S.G. § 2A1.1(b)(7).

[22] Head's range of 100-125 months was capped by the 8-year statutory maximum sentence for a violation of 18 U.S.C. § 111(a).

[23] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  Neither Officer B.M. nor Officer D.P. (nor the MPD on their behalf) is seeking restitution for expenses incurred because of injuries caused by Whitton.[24]  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Whitton must pay $2,000 in restitution, which reflects in part the role Whitton played in the riot on January 6.[25] Plea Agreement at ¶ 11.

As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of May 2021. *Id.* (The amount of damages has since been updated by the Architect of the Capitol and USCP and amounts to more than $2.9 million.  This figure does not include additional damages incurred by MPD, including the expenses referenced in footnote 24 above.) Whitton's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim

---

[24] MPD incurred a total of $30,165.65 on Officer A.W.'s behalf attributable to the injuries he suffered on the LWT.

[25] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

entities. *See* PSR ¶ 131.

## VII.    FINE

Whitton's conviction under Section 111(b) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Whitton has raised money in an online campaign through GiveSendGo, a fundraising website, through a webpage operated by his girlfriend. As of December 2022, Whitton had raised $61,685 through the website.[26] PSR ¶ 103. Whitton should not be able to "capitalize" on his participation in the January 6 riot in this way.

---

[26] The fundraising campaign has since been "unpublished" and visitors to the website are directed to send money to Whitton directly at the BOP facility at which he is housed.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 97 months incarceration, three years of supervised release, $2,000 in restitution, a $61,685 fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY: _____
Benet J. Kearney
Assistant United States Attorney
1 Saint Andrew's Plaza
New York, New York 10007
(212) 637 2260
Benet.Kearney@usdoj.gov