**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | **Case No. 1:21-cr-35 RC** |
| ) | |
| **v.** ) | |
| ) | |
| **JEFFREY SABOL,** ) | |
| ) | |
| **Defendant** ) | |

## <u>DEFENDANT JEFFEREY SABOL'S MEMORANDUM IN AID OF SENTENCING</u>

Defendant Jeffrey Sabol, by and through undersigned counsel, respectfully submits this memorandum and exhibits for his sentencing on March 21, 2024. Based on all factors this Court may consider, defendant asks Your Honor to impose a sentence of 42 months in prison and 3 years of supervised release.

I.      **<u>Current Posture of Jeffrey Patrick Sabol</u>**

Mr. Sabol was arrested in the Southern District of New York on January 22, 2021, and has been continuously detained since.

On August 18, 2023, Mr. Sabol appeared in the U.S. District Court for the District of Columbia located in Washington, DC, and was found guilty following a stipulated bench trial of three counts in a Twenty-Four Count Third Superseding Criminal Indictment He was convicted of the following: Count 1: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §1512(c)(2) & 2; Count 8: Robbery within the Special Maritime and Territorial Jurisdiction of the United States, in violation of 18

USC § 2111; and Count 10: Assaulting, Resisting, or Impeding Certain Officers Using a

Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) & (b).

He has not been engaged in any conduct that would jeopardize his acceptance of

responsibility in this case.

## II.    Presentence Investigation Report (PSR)

Defendant's initial PSR was filed on March 7, 2024. (ECF No. 443).  Defendant

disagrees with probations adjustment for use of a dangerous weapon on Count 10 and

submits defendant's guideline calculation should be as follows:

### *Group 1 (Count 1)*

*Base Offense Level:* 14, pursuant to USSG §2J1.2(a).                              **14**

*Specific Offense Characteristic*: None.                                          **0**

*Victim-Related Adjustments*: None.                                               **0**

*Adjustment for Role in the Offense:* None.                                       **0**

*Adjustment for Obstruction of Justice:* Mr. Sabol attempted to obstruct justice by

deleting text messages and other communications regarding January 6, 2021, requesting

another individual to delete a video sent to him by Mr. Sabol, microwaving laptops and a

hard drive, dropping his cellphone into a body of water, and attempting to flee the United

States. The offense level is increased by 2 levels, pursuant to USSG §3C1.1.      **+2**

*Adjusted Offense Level*:                                                         **16**


### *Group 2 (Count 8)*

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).                             **20**

*Specific Offense Characteristic*: During this instant offense, Officer A.W. sustained a serious bodily injury. The offense level is increased by 4 levels, pursuant to USSG §2B3.1(b)(3)(A). **+4**

*Victim-Related Adjustments*: Mr. Sabol's offense conduct caused a Metropolitan Police officer (A.W.) to sustain serious bodily injury, and Mr. Sabol was fully aware A.W. was a law enforcement officer.  The offense level is increased by 6 levels, pursuant to USSG §3A1.2(c). **+6**

*Adjustment for Role in the Offense:* None. **0**

*Adjustment for Obstruction of Justice:* Mr. Sabol attempted to obstruct justice by deleting text messages and other communications regarding January 6, 2021, requesting another individual to delete a video sent to him by Mr. Sabol, microwaving laptops and a hard drive, dropping his cellphone into a body of water, and attempting to flee the United States. Pursuant to USSG §3C1.1, a 2-level upward adjustment is warranted. **+2**

*Adjusted Offense Level*: **32**


### Group 3 (Count 10)

The applicable guideline for Count 10 is found in USSG §2A2.4 – *Obstructing or Impeding Officers*. However, if the conduct constituted aggravated assault, apply USSG §2A2.2 – *Aggravated Assault*, pursuant to the Cross Reference in USSG §2A2.4(c)(1).

*Base Offense Level:* 14, pursuant to USSG §2A2.2(a). **14**

*Specific Offense Characteristic*: According to the Presentence Investigation Report, "A dangerous weapon was otherwise used (to wit: defendant Sabol grabbed Officer A.W.'s baton and ripped it out of Officer A.W.'s hands. Defendant Sabol then assisted

codefendant Whitton and codefendant Logan James Barnhart in dragging Officer B.M. down the steps, holding Officer A.W.'s baton against Officer B.M.'s back. Once Officer B.M. had been dragged fully into the crowd, other rioters, including codefendants Peter Stager and Mason Courson, beat Officer B.M. with weapons, including a flagpole and a baton)." Therefore, the Probation Officer determined that a 4-level upward adjustment pursuant to USSG §2A2.2(b)(2)(B) was warranted.

**Mr. Sabol disagrees with the Probation Officer's assessment of this Specific Offense Characteristic for the following reasons:**

**For a specific offense characteristic adjustment to be applied pursuant to USSG §2A2.2(b)(2), a dangerous weapon must have been brandished or its use was threatened for a 3-level increase (USSG §2A2.2(b)(2)(C)) or otherwise used for a 4-level increase (USSG §2A2.2(b)(2)(B)). Pursuant to USSG §1B1.1, Application Note # 1(J), "Otherwise used: with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." In this case, there is no evidence that Mr. Sabol used the baton in any manner greater than possessing it while he assisted others in dragging Officer B.M. down the steps. His offense conduct does not justify the application of either a 4-level or a 3-level enhancement pursuant to USSG §2A2.2(b)(2)(B) or (C).**

**Secondly, Mr. Sabol maintains this enhancement cannot be applied to in his case based on the conduct of Peter Stager and Mason Courson. In _U.S. v. Jourdain_, 443 F.3d 652 (8th Cir. 2006), the Court ruled "the enhancement in USSG §2A2.2(b)(2)(A) for discharging a firearm or using a weapon may be based upon accomplice**

**conduct, where the use of the weapon by a codefendant was foreseeable to the defendant." In this case, Mr. Sabol had never met Stager or Courson prior to that moment at the U.S. Capitol and had no knowledge of their intentions or actions. Thus, their behavior was not foreseeable by Mr. Sabol, and their conduct cannot be used to justify the application of a 4-level enhancement pursuant to USSG §2A2.2(b)(2).**

**Attached as Exhibit A is a clip from Officer C.M.'s Body Cam that has been slowed down and been supplemented with a photo and words to offer evidence of defendant's objection to this enhancement. Defendant's objection to this enhancement is in no way an excuse or an attempt to alleviate his conduct, but only to ensure that his guideline range truly reflects his actions and conduct**

**+0**

*Specific Offense Characteristic*: During this instant offense, Officer B.M. sustained bodily injuries because of Mr. Sabol's offense conduct. The offense level is increased by 3 levels, pursuant to USSG §2A2.2(b)(3)(A).                                    **+3**

*Specific Offense Characteristic*: Mr. Sabol was convicted of Count 10, an offense in violation of 18 U.S.C. § 111(a)(1) & (b). If the defendant was convicted under 18 U.S.C. § 111(b), increase the offense level by 2, pursuant to USSG §2A2.2(b)(7).       **+2**

*Victim-Related Adjustments*: A Metropolitan Police officer (B.M.) was a victim in this offense and the assault against him/her was motivated by this fact. USSG §3A1.2(b) states that if subsection (a)(1) and (2) apply, and the applicable Chapter 2 guideline is from Chapter 2, Part A (Offenses Against the Person), the offense level is increased by 6 levels.                                                                                **+6**

*Adjustment for Role in the Offense:* None.                                                    **0**

*Adjustment for Obstruction of Justice:* Mr. Sabol attempted to obstruct justice by deleting text messages and other communications regarding January 6, 2021, requesting another individual to delete a video sent to him by Mr. Sabol, microwaving laptops and a hard drive, dropping his cellphone into a body of water, and attempting to flee the United States. Pursuant to USSG §3C1.1, a 2-level upward adjustment is warranted.                **+2**

*Adjusted Offense Level*:                                                                       **27**

**MULTIPLE COUNT ADJUSTMENT**

| Group | Adjusted Offense Level | Units |
|-------|------------------------|-------|
| Group 1 | 16 | 0 |
| Group 2 | 32 | 1 |
| Group 3 | 27 | ½ |

Total Number of Units: 1½

Greater of the Adjusted Offense Levels Above: 32

Increase in the Offense Level (USSG §3D1.4): +1

Combined Adjusted Offense Level: 33                                                             **33**

*Chapter 4 Adjustments:* None.                                                                  **0**

*Acceptance of Responsibility:* The Government and the Probation Officer have both acknowledged Mr. Sabol has demonstrated acceptance of responsibility for his conduct in a timely manner. Accordingly, the offense level should be reduced by 3-levels, pursuant to USSG §3E1.1(a) & (b).                                                                     **-3**

*Total Offense Level:*                                                                          **30**

### III.   Applying the Factors of 18 U.S.C. § 3553(a) to Jeffrey Patrick Sabol

**Sentencing Factors**

The fundamental rule governing consideration for the Court in sentencing is known as the "parsimony principle" and is the directive of Congress that the Court "shall impose a sentence sufficient, ***but not greater than necessary***, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation."

Criminal sanctions in the United States have four goals: retribution, deterrence, incapacitation, and rehabilitation. Retribution has been achieved through Mr. Sabol's felony conviction and his timely fulfillment of restitution in this case. As such, the Court's primary concerns at this juncture are deterrence, incapacitation, and rehabilitation.

**A. The Nature and Circumstances of the Offense- 3553(a)(1)**

January 6, 2021 was one of, if not the worst day of Jeff Sabol's life.  His actions that day have led to the loss of life's simplest pleasures, and will forever affect his life going forward, his family's life, and the Officers that were hurt and affected that day.

Defendant never intended to go to the Washington D.C. on January 6, 2021 to break the law and engage in the conduct he committed.  This was not the first political rally he attended during the 2020 election cycle.  Defendant attended a political rally, here in Washington D.C. in December 2020, and was not involved in any violence or destruction.  His actions throughout the day of January 6, 2021 were a complete aberration of the life he has lived.  Defendant was not a member, or involved with, any political group like the Proud Boys or Oath Keepers.  Although he was Indicted along

with eight other co-defendants, his actions that day were not in conjunction or pre planned with any of them.

The evidence also shows that immediately after his actions involving Officer B.M., at the Lower Western Terrace, Jeff left the U.S. Capitol.  He was not forcibly removed or detained.

There are least three factors in mitigation of the nature and circumstances of the offense that may be pertinent to the provisions of USSG §1B1.4 - _Information to Be Used in Imposing Sentence (Selecting a Point within the Guideline Range or Departing from the Guidelines)_. Although these considerations do not challenge the propriety of the finding of guilt by the Court, they are relevant to the nature and circumstances of the offense.

1.  Based on a total offense level of 30 and a Criminal History Category of I, the advisory sentencing guidelines range in Mr. Sabol's case is 97-121 months imprisonment. We believe a sentence within the advisory guidelines range would be too harsh and greater than necessary. The Honorable Anthony Kennedy, former associate justice of the Supreme Court testified before the Senate Judiciary Committee on February 14, 2007, and stated, "Our sentences are too long, our sentences are too severe, our sentences are too harsh….[and because there are so few pardons] there is no compassion in the system. There's no mercy in the system." Mr. Sabol humbly asks the Court to have compassion in his case and impose a variance sentence that is below the calculated advisory guidelines range.

2.  Secondly, the guideline sentence is too long for the offense and does not promote respect, but derision, of the law. In _U.S. v. Stern_, 590 F. Supp. 2d 945, 957 (N.D.

Ohio 2008), the Court stated, "Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake." Thus, we believe a guideline sentence would be too harsh and not promote respect for the law based on the defendant's culpability in this offense and a variance sentence below the advisory guidelines range is warranted.

3. Lastly, a term of imprisonment is more significant for a first offender so a below guidelines sentence is more just. In <u>U.S. v. Paul</u>, 561 F.3d 970 (9th Cir. 2009), the Court determined that a "within guideline sentence of 15 months was unreasonably high in part because Paul was a first-time offender with no criminal record whatsoever." Like the defendant in <u>*Paul*</u>, this instant offense is Jeff's first criminal conviction. Thus, a variance sentence below the advisory guidelines range is warranted in Mr. Sabol's case.

### B. Jeffrey Patrick Sabol's History and Characteristics- 3553(a)(1)



Jeffrey "Jeff" Patrick Sabol

The following information regarding Mr. Sabol's history and characteristics is offered as a supplement to the presentence investigation report conducted by the U.S. Probation and Pretrial Services Office.

Jeffrey "Jeff" Patrick Sabol was born on November 21, 1969, in Utica, New York, from the legal union of Andrew and Vicki Sabol (nee: Burton). Mr. Sabol reported he and his siblings were raised by both parents in Waterville, New York.



Jeff (center) with his parents and siblings

According to Jeff, his parents continue to reside in his childhood home. His father, Andrew Richard Sabol (age 84), is a retired high school teacher, and his mother, Vicki Sabol (age 80), is a retired nursing home director. Jeff reported his father suffers from hearing loss and his mother is impaired by chronic obstructive pulmonary disease (COPD).

Jeff stated he enjoyed a wonderful childhood. His parents raised him and his siblings in a very stable and loving household. They lived in a small, idyllic town that was reminiscence of the fictional television town, Mayberry. Mr. Sabol stated everyone seemed to know each other, no one locked their doors, and all the kids rode their bikes to school. Mr. Sabol reported there is no history of abuse, neglect, or domestic violence in his upbringing.

From his parents' marriage, Jeff has two siblings, an older brother, Andrew Burton Sabol, and a younger sister, Jennifer Victoria Sabol. Sadly, Jeff's brother, Andrew, died approximately nine years ago from complications from a heart arrhythmia disorder. Jeff stated he and his older brother were two years apart, and he naturally looked up to Andrew. Even though the passage of time makes Andrew's death easier to handle, Mr. Sabol stated he continues to miss his big brother and thinks of him often. Jennifer Sabol (age 52) currently resides in the Fort Stewart, Georgia area, and she is employed as a colonel in the United States Army. According to Col. Sabol, she has a close relationship with Jeff.



Jeff (r) with his siblings, Andrew and Jennifer

Upon graduating from college in 1992, Mr. Sabol reported he relocated to the Denver, Colorado area for an employment opportunity. In 1998, his employment required him to relocate to Maui, Hawaii, where he lived for one year. Jeff stated he moved back to Denver in 1999 and lived in the city until he moved to Indian Hills, Colorado (a suburban town of Denver) in 2001. In 2011, Mr. Sabol left the country due to an employment contract that required him to live and work in Afghanistan for one year. Once his contract ended, Mr. Sabol relocated to Kittridge, Colorado (another suburban town of Denver) in 2012 and was residing locally when he was arrested for this instance offense.

While living in Maui, Hawaii, Jeff was looking for a motor vehicle to purchase and fell in love with a Jeep that he had seen that was for sale. The owner of the Jeep was no longer living on the island but had a female friend to handle the sale of the Jeep to Mr. Sabol. From their interaction, a romantic relationship developed between Jeff and the seller's female friend, Sharie Fitzgerald (age 59), and they were married in June 2000 in Genesse, Colorado. According to Mr. Sabol, he and Sherrie separated in 2011, and their divorce was granted due to irreconcilable differences and finalized in February 2014. Mr. Sabol stated there were no other contributing factors to their divorce such as infidelity or financial problems. He and his ex-wife simply grew apart from each other emotionally. Jeff reported he no longer has any contact with his ex-wife, but he is aware she currently resides in Lafayette, Colorado.

From his marriage, Mr. Sabol has three children, Wyatt (age 22), Sophie (age 22), and Sasha (age 18) Sabol. Wyatt and Sophie are fraternal twins. According to Jeff, he and his ex-wife shared joint custody of their children. Even though he has been detained for

over three years due to this instant offense, Mr. Sabol has continually satisfied his $500 a month child support obligation for his youngest daughter from donated funds to a GiveSendGo account set up on his behalf. Jeff reported that almost 100% of the money donated to him has been used to support his children. Jeff's ex-wife provided a notarized statement attesting to the fact that Mr. Sabol has continued to fulfil his financial obligation to his daughter since he has been incarcerated, and it is attached to this report. (Exhibit B). This action by Jeff to continue to uphold his obligation to his family speaks volumes about the human being he is and strong proof that his chance of recidivism is non-existent.



    Prior to being arrested for this instant offense, Mr. Sabol reported his daughters lived with him while his son lived with his mother. However, his son would frequently come over to visit Jeff's residence.

Mr. Sabol stated he is currently estranged from his children. In 2017, he got into a heated argument with Wyatt about his poor grades in school. According to Jeff, he and his son are very much alike, but he felt his son crossed a line by being disrespectful to him. To mend their relationship, Mr. Sabol stated he went to therapy with Wyatt, but his son refused to talk during the sessions. Jeff reported he has not spoken directly to Wyatt since 2017. Reportedly, Wyatt currently resides in an unknown city/town in the state of New Mexico. Due to Jeff being detained for this instant offense, Sophie and Sasha moved in full-time with their mother in Lafayette, Colorado. According to Mr. Sabol, both of his daughters are disappointed in him and resentful that he engaged in conduct that has severely disrupted and hindered the lives of everyone in their family. Mr. Sabol stated his children mean everything to him, and it hurts his soul to not have a closer relationship with all of them at this time.



In July 2012, Jeff began dating Michelle Waufle. Ms. Waufle was the coworker of Jeff's mother, and she lived in a home next door to Jeff's parents that was owned by them. Although Ms. Waufle had known Jeff for several years, they had never previously had an in-depth conversation. When she heard Jeff and his three children were coming to Waterville, NY, to visit his parents, Ms. Waufle made cookies and went over to say hello. Jeff had made plans to stay in Waterville for several weeks so that he and the kids could spend time with his parents. According to Ms. Waufle, Jeff's parents invited her several times to accompany them when they took day trips or went sightseeing with Jeff and the grandchildren.

Both she and Jeff were going through divorces at the same time and realized they were mutually interested in each other. Once it was time for Jeff to return to Colorado, they decided to try having a long-distance relationship with one another.

After approximately a year of being apart, Ms. Waufle moved to Colorado to live with Jeff. However, she kept her home in New York and frequently returned to Waterville for extended periods of time to be with her family. After the death of her mother in 2014, Ms. Waufle relocated to Colorado fully.





Due to Jeff's arrest for this instant offense, Ms. Waufle had to quit her job in Colorado and move back into her home in Waterville, New York. Due to financial concerns, Ms. Waufle stated she has to work three part-time jobs, seven days a week while also trying to take care of Jeff's elderly parents in his stead. According to Ms. Waufle, she and Jeff are engaged to marry, but they have not yet set a wedding date due to being uncertain as to how much longer he will be detained.



_Substance Abuse and Treatment_

According to Jeff, he began smoking marijuana when he was a senior in college in 1991 or 1992. For several years, he would smoke marijuana almost daily until he obtained a job as a geophysicist when he was approximately 30 years old. When he was arrested for this instant offense, Mr. Sabol stated his marijuana usage was legal in the state of Colorado, but he only smoked recreationally once or twice a month, particularly after playing rugby with friends. In the mid-to-late 1990s, Jeff stated he experimented with LSD, psilocybin mushrooms, GHB, and cocaine.

Mr. Sabol reported he began consuming alcohol intermittently while in high school. While in college, his alcohol consumption increased to frequent usage on the weekends. According to Jeff, he has never had any issues with his consumption of alcohol and would drink approximately two beers nightly.

Jeff reported he has never received any substance abuse treatment or counseling, and he has never been hospitalized due to abusing controlled substances or alcohol.

*Mental Heath*

In January 2021, Mr. Sabol was in a local store when he saw a television broadcast with his picture and an FBI request to the public to help identify him. Due to his fear of being arrested for this instant offense, Mr. Sabol panicked and inexplicably attempted to commit suicide by cutting his wrists and thigh with a boxcutter. Immediately after doing so, Jeff came to the realization that he had much to live for and did not want to die. He then tried to prevent his blood loss and asked an individual passing by to call 911 for him. As a result of this suicide attempt, Mr. Sabol was hospitalized in a psychiatric unit for approximately 10 days. Upon his release from the hospital, Jeff was arrested for this instant offense. Prior to this incident, Mr. Sabol reported he had never previously contemplated suicide, nor had suffered from any mental health issues.

*Employment*

Mr. Sabol has been gainfully employed full-time in the field of geophysics for several employers since 1993.

Due to being detained for this instant offense, Jeff was terminated from his position as a senior geophysical manager for Kemron Environmental Services. Mr. Sabol had worked for this company since February 2014.

Based on his excellent work history and expertise, Mr. Sabol has been invited to apply for a position with Kascon Environmental Services located in Waterville, New York. This company submitted a letter stating they are fully aware of Mr. Sabol's current legal status, and he is welcome to apply for a position once his legal matters are settled. A copy of this letter is attached to this report. (Exhibit C)

It should be noted that Mr. Sabol was a volunteer with the Westernaires non-profit organization located in Golden, Colorado, for several years prior to his arrest for this instant offense. The Westernaires is a mounted precision drill organization composed of Denver-area youngsters from the ages of 9 to 19 years old (www.westernaires.org).





According to Jeff, he oversaw the care of the program's horses and their stable each weekend. Due to the significant amount of time he spent volunteering each week, Mr. Sabol stated he encouraged his children to volunteer also, and it became a family thing to spend their weekends together taking care of the horses.

Lastly, weeks prior to January 6, 2021, Jeff was on the verge of launching his own invention; a state of the art, patent approved, snowboard binding called "Revolver Gear". (See revolvergear.com).  Jeff plans on continuing to get the product launched when he is released from custody.  His desire to see his product launched and out in the market is further evidence of Jeff having no risk of recidivism.

*Education*

Jeff reported he graduated in May 1992 from the State University of New York College at Cortland located in Cortland, NY, with a B.S. degree in physics.

*Community Support*

As indicated by the numerous letters of support written by his family and friends, Mr. Sabol has strong community ties who are willing to assist in his transition back into society.

Upon his release from incarceration, Jeff plans to live with his fiancée in Waterville, New York, seek employment with Kemron Environmental Services, and take care of his elderly parents.

Although he was raised Catholic by his parents, Mr. Sabol stated his family was not very religious and only attended mass at Christmas. While living in Denver, Jeff was exposed to Protestantism, gave his life to Christ, and became a "born-again" Christian. Even though he stopped going to church in or about 2004, Mr. Sabol is looking to get reconnected with another church in New York and expounding on his knowledge about his faith.

*Remorse*

Many January 6 defendants have celebrated, bragged, and shown great joy following their actions on January 6, 2021.

As stated above and mentioned in defendant's PSR, Jeff attempted to take his own life on January 11, 2021 by slitting his wrists and leg.  Thankfully, Jeff realized that no matter what he did that day, or what future harm he might have caused himself and his

family, he still had a reason to live and a family that loved him and wanted him to be
alive.  He was able to get himself to a local hospital and avoid dying by suicide.

Jeff has attached 28-character letters from family and friends, both from when he
was initially arrested and as recently as the first week of March 2024. (Exhibit D). Jeff
has also included a written statement on his behalf with this memo (Exhibit E) along
with exhibits he asks the court to consider. (Exhibit F, G, and H)

**C. The Need for the Sentence Imposed to reflect the Seriousness of the Offense, to**

---

**Promote Respect for the Law, and to Provide Just Punishment for the Offense-
3553(a)(2)(A)**

Due to the historical impact of the events that occurred on January 6, 2021, not
only a large portion of U.S. citizens, but the entire world is watching and monitoring
what happens to those arrested due to their involvement on that infamous day. Thus, the
Court has an even greater burden to fulfill its mission to impose a sentence that reflects
the seriousness of the offense, promote respect for the law, and provide a just punishment
for Mr. Sabol's offense conduct.

We believe the Court would still fulfill its mission by imposing a variance
sentence that is below the advisory guidelines range of 97-121 months. Jeff Sabol is not a
violent man and regrets being caught up in his emotions and engaging in conduct that is
not reflective of the law-abiding man and loving father that he has always strived to
project.

**D. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal
Conduct- 3553(a)(2)(B)**

Today, news is broadcast almost instantaneously to everyone and everywhere. The public in general and those individuals willing to engage in illegal criminal activity have become aware of the risk of being incarcerated for a substantial amount of time if they commit a crime like the ones committed by Jeff Sabol.

Although it has been over three years since the riot at the U.S. Capitol occurred on January 6, 2021, the news media and a significant portion of the United States' population keep abreast of any arrests or sentences imposed upon individuals involved on that ill-reputed day in U.S. history. Additionally, there are numerous websites, databases, and news organizations that track the status of every defendant brought before the Court due to their involvement on January 6.

Most people, including Mr. Sabol, have now become aware of the risk and likelihood of being incarcerated for a substantial amount of time if they commit a crime like the one committed by Jeff. Thus, the sentence imposed upon Mr. Sabol will be more than sufficient to serve as a general deterrence to others.

At sentencing, Jeff will have been detained for three years and two months while awaiting an outcome in this case. Mr. Sabol understands that his advisory sentencing guidelines range recommends he continue to serve a term of imprisonment for several more years. As a result, Jeff is determined to never put himself in this position again and this conviction will serve as a specific deterrence to Mr. Sabol from committing further crimes.

### E. The Need for the Sentence Imposed to Protect from Further Crimes by Jeffrey Sabol- 3553(a)(2)(C)

Except for this instant offense, Mr. Sabol has been a peaceful, law-abiding, non-violent man for over 54 years, and his involvement in this instant offense is an aberration.

According to the Presentence Investigation Report, Mr. Sabol has a criminal history score of zero points, and his Criminal History Category is I. Due to this offense involving violence, Jeff is prohibited from receiving a two-level downward adjustment to his offense level pursuant to USSG §4C1.1 – *Adjustment for Certain Zero-Point Offenders.*

In the United States Sentencing Commission's Report, "Recidivism and the First Offender" (May 2004), "the analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points.

Based on Mr. Sabol's lack of prior criminal behavior and empirical data by the Sentencing Commission, the likelihood of Jeff committing another similar offense or being engaged in any criminal activity is highly unlikely and there is little need to impose a lengthy sentence to protect society from further crimes by Mr. Sabol.

Upon his release from imprisonment, Jeff is looking forward to going home to be with his fiancée, his children, focusing on the care of his elderly parents, and being a productive member of his community.

### F. To Provide Jeffrey Sabol with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner- 3553(a)(2)(D)

Mr. Sabol's prior suicide attempt was an isolated incident, and he is not in need of mental health treatment or counseling at this time. Also, Jeff is college educated and has an extensive employment history working in the field of environmental services and geophysics. Although Jeff admits to prior drug usage, he admits to only smoking marijuana recreationally monthly when he was arrested for this offense.

Thus, it appears Mr. Sabol is not in need of mental health counseling, educational or vocational training while in the custody of the Bureau of Prisons. Even though Jeff could benefit from participating in drug treatment, a lengthy term of imprisonment is not necessary since treatment could be effectively rendered by a treatment provider in the community while Mr. Sabol serves a term of supervised release.

Therefore, we believe a lengthy term of imprisonment is not necessary to provide Mr. Sabol with correctional treatment in the most effective manner.

### G. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct- 3553(a)(6)

One of the most difficult and relevant factors this Court must consider is the need to avoid unwarranted sentencing disparities.

According to the United States Sentencing Commission's statistics for Fiscal Year 2022, the national mean sentence length for assault offenses was 66 months imprisonment and the median sentence length was 46 months imprisonment.



For the DC Circuit specifically, the mean sentence length was 56 months imprisonment, and the median sentence length was 46 months imprisonment.



In the cases for Mr. Sabol's codefendants, the following sentences have been imposed:

| Codefendant | Sentence of Imprisonment Imposed |
|---|---|
| Peter Stager | 52 months |
| Michael Lopatic, Sr. | Deceased |

| Clayton Mullins | 30 months |
|---|---|
| Jack Whitton | Sentencing to be held on 3/20/2024 |
| Logan Barnhart | 36 months |
| Ronald McAbee | 70 months |
| Mason Courson | 57 months |
| Justin Jersey | 51 months |

Upon review of the offense conduct for each codefendant, we believe the offense conduct of Clayton Mullins is comparable to Mr. Sabol's. Both Mullins and Jeff engaged in pushing other rioters against the blockade line of police officers, engaged in "tugs-of-war" with police officers for the officers' equipment, and assisted in pulling police officers away from the blockade line into the crowd of rioters. However, neither Clayton Mullins nor Jeff Sabol used dangerous weapons, other objects, or their fists to strike officers, unlike codefendants Mason Courson, Jack Whitton, Peter Stager, Logan Barnhart, Ronald McAbee, and Justin Jersey.

We respectfully recommend the Court to consider imposing a sentence in Mr. Sabol's case that is less than the sentences of co-defendant Stager, Jersey, and Courson. A sentence of 42 months would be a just sentence and allows the Court to avoid an unwarranted sentencing disparity between defendants with similar records who have been found guilty of similar conduct.

## H. The Need to Provide Restitution to the Victim- 3553(a)(7)

For most of the defendants involved in the riot at the U.S. Capitol on January 6, 2021, it appears the Government has been recommending restitution in the amount of

$2,000 for individuals convicted of a felony. In this case, most of Mr. Sabol's codefendants have also been required to pay $2,000 in restitution.

Although Jeffrey will have the opportunity to pay restitution while incarcerated through the Bureau of Prison's Inmate Financial Responsibility Program, the amount he earns while incarcerated pales in comparison to what he could earn once he returns to society. Therefore, a lengthy term of imprisonment would hinder Mr. Sabol's ability to make restitution to the citizens of the United States.

## Conclusion

In consideration of the forgoing discussion and analysis, we believe there is ample evidence to allow the Court to impose a variance sentence of 42 months imprisonment that is below the advisory sentencing guidelines range of 97 - 121 months imprisonment.

We have attempted to fully address the factors in 18 U.S.C. § 3553(a) that the Court must consider. Jeffrey Sabol respectfully requests that the Court utilizes this information to satisfy its mission to impose a sentence that is sufficient, but not greater than necessary under the circumstances of this case.

Respectfully Submitted,

s/Alex Cirocco

Alex Cirocco, Esq.
Attorney for Jeffrey Sabol
DC Bar ID # NJ 037
Law Offices of Alex Cirocco, LLC
547 Union Blvd., 2nd Floor
Totowa, NJ 07512
973-327-9995
alex@ciroccolaw.com

28

## **EXHIBIT LIST**

| EXHIBIT NAME | DESCRIPTION |
|---|---|
| Exhibit A | Officer C.M. Bodycam |
| Exhibit B | Child Support Letter |
| Exhibit C | Employment Letter |
| Exhibit D | Character Letters |
| Exhibit E | Defendant's Letter to the Court |
| Exhibit F | Fingerprints of Fraud Document |
| Exhibit G | Summary of Election Fraud Document |
| Exhibit H | Compilation Video from Lower Western Terrace (10:48 in length) |